UNITED STATES ET AL. *v.* GREAT
NORTHERN RAILWAY CO.

No. 151.   Argued January 8–9, 1952.—Decided June 2, 1952.

*Ralph S. Spritzer* argued the cause for the United States and the Interstate Commerce Commission, appellants. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Daniel W. Knowlton* and *Edward M. Reidy.*

*Arnold H. Olsen,* Attorney General of Montana, argued the cause for the Valier Community Club and the Board of Railroad Commissioners of Montana, appellants. With him on the brief were *Charles V. Huppe,* Assistant Attorney General, *Edwin S. Booth* and *Lester H. Loble.*

*Art Jardine* argued the cause for the Montana Western Railway Co., appellant. With him on the brief was *S. B. Chase, Jr.*

*Louis E. Torinus, Jr.* argued the cause for appellee. With him on the brief were *Edwin C. Matthias* and *Anthony Kane.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

This is a suit to enjoin enforcement of an order of the Interstate Commerce Commission establishing joint rates over through routes. In this case, unlike *Thompson* v. *United States,* 343 U. S. 549 (decided this day), the through routes in question already exist since the carriers

concerned have continuously provided through service over the same through routes at a combination of separately established rates. The Commission did not change any route or alter the total amount charged for any shipment but did order the establishment of joint rates in place of the combination rates. The Commission also ordered a division of revenues between the carriers in order to provide additional revenue for one financially weak carrier. The question presented is whether the Commission has power to establish joint rates for the purpose of assisting a carrier to meet its financial needs.

The Montana Western Railway Company, incorporated in 1909, furnishes the only rail service over the twenty miles between Valier, Montana, and Conrad, Montana, where connection is made with the interstate rail lines of the appellee Great Northern Railway. Appellee and a land irrigation company, now called the Valier Company, furnished the money to build the railroad. The Montana Western's stock is owned by the Valier Company and its bonds in the sum of $165,000 are held by appellee.

Operation of the Montana Western has been unprofitable. An average annual deficit of over $18,000 has been experienced during the fifteen years preceding this case. The Montana Western's general manager estimated that the total annual revenue deficiency under existing rates would amount to $33,825. In addition to the anticipated operating losses, continued operation of the Montana Western would require construction of a new bridge and a new roundhouse and replacement of a large number of crossties. The Montana Western has not been able to satisfy either its bonded indebtedness or the interest thereon. Moreover, appellee has advanced money to pay operating losses to the extent that Montana Western's total debt to appellee amounted to $737,604 at

the beginning of these proceedings. Apparently because of the Montana Western's value as a feeder line providing profitable traffic, appellee offered to provide additional funds for the rehabilitation of the Montana Western and offered to extend the maturity date of the mortgage bonds. However, the Montana Western's officers refused to extend the bonds on the ground that there was no hope of ever paying off the indebtedness. Thereafter, appellee announced that: "In view of the Montana Western's attitude . . . Great Northern cannot be expected [to make further cash advances]."

The Montana Western applied to the Interstate Commerce Commission for the permission to abandon its entire line, required under 49 U. S. C. § 1 (18)–(22), on the ground that, without financial assistance from appellee, continued operation of the line was not economically feasible. After hearings in the abandonment proceeding had demonstrated the financial plight of the Montana Western, the Valier Community Club, representing shippers in the Valier area, instituted another action before the Commission.[1] The shippers' purpose was to preserve existing through routes originating at Valier by securing for the Montana Western the additional revenue needed for continued operation. Since ninety percent of the Montana Western's revenue is derived from grain traffic, additional revenue necessarily had to be obtained through adjustment in the grain rate structure.

Grain now moves on through routes from Valier over the Montana Western line to Conrad where appellee continues the through shipment to market. Under the

---

[1] Appellee was not a party before the Commission until this complaint was filed. The record of prior hearings in the abandonment proceeding was incorporated into the complaint proceeding and appellee was afforded the opportunity to cross-examine the witnesses who had previously testified.

existing grain rate structure, a shipper pays a through rate of 71½ cents per hundred pounds on a shipment from Valier to Minneapolis. This through rate is also called a combination rate because it is a combination of Montana Western's separately established proportional rate of 9 cents from Valier to Conrad plus appellee's proportional rate of 62½ cents to Minneapolis.[2] Complainant Valier Community Club did not propose to alter any existing through routes or change the amount of any through rates. Rather, complainant asked the Commission to increase Montana Western's revenue by substituting "joint rates" for the present combination rate and determining a division of joint rates that would have the effect of increasing the Montana Western's present compensation of 9 cents for the Valier to Conrad segment of the through shipments.

After hearing evidence on the complaint, an Examiner recommended that the Montana Western's application for abandonment be denied because of the public need for railroad service in the Valier area. He further recommended that joint rates on grain be established from Valier to all interstate points on appellee's lines at the level of the present combination rates. After comparing division of revenues on similar joint rates established on other lines in the area, the Examiner recommended that the Montana Western receive a division of 10 cents, an increase of 1 cent over the present proportional rate. The Interstate Commerce Commission agreed that the public need for rail service in the Valier area called for denial of

---

[2] The local rate from Conrad, Montana, to Minneapolis is 65½ cents. When a through rate consists of a combination of rates for intermediate distances, the rate for one segment of the shipment is referred to as a proportional rate where, as here, that rate is lower than the local rate over that segment. See *Atchison, T. & S. F. R. Co.* v. *United States*, 279 U. S. 768, 771 (1929); Berry, A Study of Proportional Rates, 10 I. C. C. Pract. J. 545 (1943).

the abandonment application. The Commission also agreed that the public interest required establishment of joint rates. However, the Commission, stating that financial needs were a justification for relatively high divisions, ordered, for example, that the Montana Western receive 16.3 cents as its share of the 71½ cents through rate on a shipment from Valier to Minneapolis. 275 I. C. C. 512. It is conceded by the Commission in this Court that its order establishing joint rates was but a means to the end of assisting the Montana Western to meet obvious financial needs.

Appellee brought this action in the District Court to enjoin enforcement of that part of the Commission's order establishing joint rates and divisions of revenues. A three-judge court rejected the Commission's contention that Section 15, paragraphs (3) and (6), of the Interstate Commerce Act authorized the order; instead, it enjoined enforcement of the order as one prohibited by a provision of Section 15 (4).[3] 96 F. Supp. 298. The relevant statutes are set forth in the margin.[4] The case

---

[3] The Commission did not discuss Section 15 (4) in its report. We were advised at the bar of this Court that the question presented by that Section was first raised before the Commission on a petition for reconsideration which was denied without opinion. Since appellants, including the Commission, have considered the Section 15 (4) question as having been properly raised before the Commission, we also treat the question as properly before us. Compare *Unemployment Compensation Commission* v. *Aragon,* 329 U. S. 143, 155 (1946); *United States* v. *Hancock Truck Lines,* 324 U. S. 774 (1945); *General Transp. Co.* v. *United States,* 65 F. Supp. 981 (D. Mass. 1946), aff'd, 329 U. S. 668 (1946) (waiver issue not raised on appeal).

[4] "(3) The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property

was brought here on direct appeal by the United States, the Interstate Commerce Commission, the Valier Community Club, the Montana Western Railroad, and the Board of Railroad Commissioners of the State of Montana, appellants. 28 U. S. C. (Supp. IV) § 1253.

---

by carriers subject to this part, . . . ." 54 Stat.·911, 49 U. S. C. § 15 (3).

"(4) In establishing any such through route the Commission shall not (except as provided in section 3, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. In time of shortage of equipment, congestion of traffic, or other emergency declared by the Commission, it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest." 54 Stat. 911–912, 49 U. S. C. § 15 (4).

"(6) Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise

*First.* Under Section 15 (3), the Commission is empowered to "establish through routes, joint classifications, and joint rates, fares, or charges." The only pertinent limitation to their establishment found in Section 15 (3) itself is that the Commission deem such action "necessary or desirable in the public interest."

Once joint rates are lawfully established, the Commission is authorized by Section 15 (6) to prescribe "just, reasonable, and equitable divisions" of revenue between the participating carriers and to determine such divisions by giving due consideration to various listed factors, including "the amount of revenue required" by participating carriers. In *The New England Divisions Case,* 261 U. S. 184, 189–195 (1923), this Court held that Section 15 (6) was designed for affirmative use in relieving the financial needs of weak carriers.[5]

---

established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, . . . . In so prescribing and determining the divisions of joint rates, fares and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge." 41 Stat. 486, 49 U. S. C. § 15 (6).

[5] The Montana Western and appellee maintain joint rates established by agreement for many commodities, including coal, lumber and livestock. If it had happened that a joint rate had been agreed upon for grain (or that the bulk of Montana Western's revenues were derived from commodities that now move on joint rates), the Commission could have diverted additional revenue to the Montana Western without resort to the power granted in Section 15 (3).

Section 15 (4) conditions the powers granted the Commission in Section 15 (3). Prior to the Transportation Act of 1940, Section 15 (4) contained two provisions, one being the restriction on the Commission's power to establish a through route that would require a carrier to short haul itself, considered in *Thompson* v. *United States,* 343 U. S. 549 (decided this day), and the other granting the Commission additional power to establish through routes in emergencies. The 1940 revision of Section 15 (4) retained the emergency through route provision, increased the power of the Commission to establish through routes which require a carrier to short haul itself and added the following provision:

> "No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs."

The Commission's order in this case did not establish any through route, but did establish joint rates for the admitted purpose of assisting the Montana Western Railway to meet its financial needs. As stated above, the District Court held that such an order was prohibited by the above-quoted provision of Section 15 (4).

*Second.* Much of appellants' argument against the holding of the District Court misses the mark. Appellants construe the prohibition against establishing through routes for the purpose of assisting a· carrier to meet its financial needs as limited to cases where short hauling is a problem. Appellants would have the Court read the financial assistance prohibition as merely another restriction on the Commission's power to require a carrier to short haul itself in addition to the restriction against short hauling found in the first provision of Section 15 (4). Since existence of a short-hauling problem

presupposes the existence of alternate rail connections, such a problem cannot arise in this case where the Montana Western is the only carrier serving Valier.

Appellants would have the Court ignore the fact that the financial assistance prohibition stands as a separate sentence in Section 15 (4). Certainly that sentence is grammatically capable of independent significance. And it may be noted that the sentence is directed to a specific problem that arose in the administration of the Commission's power under Section 15 (3) and (4) to establish through routes—a problem quite separate from that presented by the restriction against short hauling. This different problem arises when a carrier asks the Commission to establish a through route, not primarily to serve any need of the shipping public for additional routes, but because the carrier needs additional revenue which it seeks to obtain by diverting to its own line traffic served by other routes. The question presented in such a case is whether the Commission's power to establish through routes "in the public interest" extends to establishing through routes, with the resulting rearrangement in the movement of rail traffic, for the purpose of meeting the financial needs of a carrier. This question was presented in the through route litigation that led to the 1940 revision of Section 15 (4) [6] and was repeatedly raised dur-

---

[6] In the *Subiaco* litigation, a short-line carrier asked the Commission to establish a through route that included its line. The Commission's report stated the questions presented as (1) the applicability of the short-haul limitation of Section 15 (4), and (2) whether it was in the public interest to establish a new through route so that the financially weak carrier would benefit from new business and resulting increased revenues. The Commission ordered establishment of the new route over the dissent of one Commissioner on the second question. *Ft. Smith, Subiaco & R. I. R. Co.* v. *Alabama & Vicksburg R. Co.*, 107 I. C. C. 523 (1926). Reaching only the short-haul

ing the legislative consideration of the amendments to Section 15 (4).[7]

As revised in 1940, Section 15 (4) deals at length with the short-haul problem and, in addition, contains the separate sentence prohibiting the establishment of through routes for the purpose of assisting a carrier to meet its financial needs. Since this prohibition stands as an independent sentence dealing with an independent problem, we cannot accept appellants' suggestion that the sentence can be ignored unless a short-hauling problem is also involved in the case.

*Third.* Although the prohibition against establishment of through routes and joint rates applicable thereto for the purpose of assisting a carrier to meet its financial needs cannot be read as limited to short-hauling situations, it by no means follows that the prohibition may be read as applicable to all Commission orders establishing joint rates.

The Interstate Commerce Act contemplates the existence of through routes in the absence of joint rates.[8] And

question, this Court held the order invalid in *United States* v. *Missouri Pacific R. Co.,* 278 U. S. 269 (1929). Efforts to amend Section 15 (4) began with the final decision in the *Subiaco* litigation. See *Thompson* v. *United States,* 343 U. S. 549 (decided this day).

[7] See Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 5364, 74th Cong., 2d Sess. 70–71 (1936); Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on S. 1261, 75th Cong., 2d and 3d Sess. 104–106, 159–160 (1937, 1938); Hearings before a Subcommittee of the Senate Committee on Interstate Commerce on S. 1085, 76th Cong., 1st Sess. 88–89 (1939); Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 3400, 76th Cong., 1st Sess. 232–234 (1939). See also S. 1261, 75th Cong., 1st Sess.; S. Rep. No. 404, 75th Cong., 1st Sess. 3 (1937).

[8] It is the duty of every carrier to establish reasonable through routes but there is no corresponding duty to establish joint rates with

this Court expressly has approved the Commission's consistent recognition of the existence of through routes whether the through rates applicable thereto are joint rates or combinations of separately established rates.[9] As a result, the establishment of joint rates is an act separate and distinct under the statute from the establishment of through routes. In this case, the Commission ordered the establishment of joint rates over through routes, Valier to Minneapolis for example, which were already in existence on a combination of proportional rates. Under the Commission's order, the same cars would move over the same tracks to the same destinations and at the same through rates as before. It is a matter of little concern to shippers whether combination rates or joint rates at the same level are charged, so long as the through route continues to be available.[10] Whatever theories may be advanced as to determining the existence of a through route where no traffic passes over the route, see *Thompson* v. *United States,* 343 U. S. 549 (decided

other carriers. 49 U. S. C. § 1 (4). Joint rates may be established either by agreement of the carriers, 49 U. S. C. § 6 (4), or by Commission order, 49 U. S. C. § 15 (3). Section 6 (1) of the Interstate Commerce Act requires that a carrier file and post all rates, fares, and charges between different points on its own routes and between points on the route of any other carrier "when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file [and post] the separately established rates, fares, and charges applied to the through transportation." 49 U. S. C. § 6 (1). See *Brown Lumber Co.* v. *Louisville & N. R. Co.,* 299 U. S. 393, 395 (1937).

[9] See *St. Louis Southwestern R. Co.* v. *United States,* 245 U. S. 136, 139 (1917), quoted in *Thompson* v. *United States,* 343 U. S. 549 (decided this day). See also *Virginian R. Co.* v. *United States,* 272 U. S. 658, 666 (1926).

[10] See *Louisville & N. R. Co.* v. *Sloss-Sheffield Steel & Iron Co.,* 269 U. S. 217, 234 (1925).

this day), it is not questioned that through routes over the Montana Western and appellee's lines long have been in existence. These through routes were not established by the Commission in this case.

Commission action establishing joint rates in lieu of combination rates for service over through routes is a proper form of regulation.[11] It is crucial to this case that the financial-needs prohibition of Section 15 (4) does not limit the Commission's power to establish joint rates generally, but deals only with the power to establish a "through route and joint rates applicable thereto," i. e., those joint rates applicable to a through route established by the Commission. Since the order in this case did not establish a through route, Section 15 (4) does not affect the Commission's power in this case. And, because joint rates published by two or more carriers are by definition always applicable to a through route over the lines of those carriers, reading the financial assistance prohibition as affecting this order establishing only joint rates for existing through routes would render the words "applicable thereto" surplusage, attributing to Congress a useless and misleading use of words.

It is one form of regulation to redistribute revenues between connecting carriers by determining divisions of revenues received on existing through routes. The economic ramifications are quite different if the Commission establishes through routes which divert traffic to the lines of a financially weak carrier. Such action not only serves to assist that carrier financially but can also, at the same time, cause important changes in the movement of traffic, diverting traffic to a new geographic area at the expense

---

[11] Regulation in "the form of compelling the substitution of a joint rate for a through rate made by a combination of local rates" was approved in *St. Louis Southwestern R. Co.* v. *United States,* note 9, *supra,* at 142.

of other carriers and other areas. Congress amended Section 15 (4) to prohibit tinkering with through routes for the purpose of assisting a carrier to meet its financial needs. But the provisions of Section 15 (4)—the restrictions against short hauling, the financial-needs prohibition and the emergency route provision—all deal with the Commission's power to establish through routes.

Congress could well have prohibited the Commission from considering financial needs in issuing any order under Section 15 (3). This was proposed in one bill and expressly rejected by a congressional committee.[12] Or, Congress could have prohibited consideration of financial needs in ordering establishment of *joint* through routes where through routes were in existence, as was also proposed.[13] Instead, Congress adopted a provision prohibiting reliance on financial needs only in respect to orders establishing through routes. It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written. Where, as here, the Commission did not establish through routes, Section 15 (4) has no application.[14]

Beginning with the Transportation Act of 1920, Congress has regulated the railroads not only to prohibit such abuses as excessive and discriminatory rates but also with the purpose of assuring adequate transportation service.

---

[12] S. Rep. No. 404, 75th Cong., 1st Sess. 3 (1937).

[13] Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on S. 1261, 75th Cong., 2d and 3d Sess. 106 (1937, 1938); Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 3400, 76th Cong., 1st Sess. 234 (1939).

[14] The Commission has recognized in prior cases that in establishing joint rates over existing through routes, the provisions of Section 15 (4) respecting establishment of through routes are not applicable. See *Beaman Elevator Co.* v. *Chicago & N. W. R. Co.,* 148 I. C. C. 444, 451 (1928), 155 I. C. C. 313 (1929).

*The New England Divisions Case, supra.* The relationship between this transportation policy and the power of the Commission to prescribe divisions of joint rates was described by the Court in *United States* v. *Abilene & Southern R. Co.,* 265 U. S. 274, 284–285 (1924):

> "It is settled that in determining what the divisions should be, the Commission may, in the public interest, take into consideration the financial needs of a weaker road; and that it may be given a division larger than justice merely as between the parties would suggest 'in order to maintain it in effective operation as part of an adequate transportation system,' provided the share left to its connections is 'adequate to avoid a confiscatory result.' *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456, 477; *New England Divisions Case,* 261 U. S. 184, 194, 195."

The power of the Commission to establish joint rates is similarly essential to the congressional policy of assuring adequate transportation service, as expressly stated in *The New England Divisions Case, supra,* at 194–195. The Transportation Act of 1940 reenacted the provisions of the Interstate Commerce Act implementing that policy and added that the Act was to be administered so as to develop, coordinate, and preserve an adequate "national transportation system." [15]  Since the financial assistance prohibition of Section 15 (4), added by the Transportation Act of 1940, restricted the Commission's power over joint rates only in respect to those joint rates applicable to through routes established by the Commission, the Commission's power to establish joint rates over existing through routes remains unimpaired.

[15] 54 Stat. 899 (1940).

As a result, the Commission is empowered, in the public interest, to cause a redistribution of revenue between two carriers participating in transportation of through traffic. It is immaterial, from the viewpoint of the public, whether the revenue was obtained by charging joint rates established by agreement of the carriers or by a combination of separately established rates. And, from the viewpoint of the national transportation system, it is immaterial whether an independently owned rail line is saved from abandonment by such a redistribution of revenue or whether permission to abandon a branch of a main line carrier is denied on the basis of a similar reallocation of revenue. Just as the Commission may examine into the value of a branch line as "feeding" additional traffic to the main line of a single carrier, the value of the Montana Western as producing traffic for appellee need not be disregarded by the Commission.[16] Indeed, the Montana Western's value in producing profitable traffic for appellee is shown by the fact that appellee was willing to continue and even increase its financial support while the Montana Western itself chose to seek abandonment.

We hold that the District Court erred in enjoining the Commission's order as prohibited by Section 15 (4). Apart from the question of the Commission's power to establish joint rates, the Commission's order establishing joint rates and divisions in this case is attacked for want of essential findings and for lack of substantial

---

[16] In passing upon applications to abandon branch lines under 49 U. S. C. § 1 (18)–(20), the Commission has required a showing of the "feeder value" of the branch by crediting to that branch the gross system revenues less the estimated cost of moving the traffic over the rest of the system. *E. g., Chicago, R. I. & P. R. Co. Trustees Abandonment,* 254 I. C. C. 187, 190 (1943). See Cherington, The Regulation of Railroad Abandonments (1948), 159–166.

evidence justifying continued operation of this particular carrier. Since it is the practice of this Court not to review an administrative record in the first instance after finding that a lower court has applied an incorrect principle of law,[17] the case is remanded to the District Court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACK, MR. JUSTICE JACKSON and MR. JUSTICE BURTON concur in the result.

---

[17] Compare *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474 (1951), with *O'Leary* v. *Brown-Pacific-Maxon, Inc.,* 340 U. S. 504, 508 (1951).