**SEABOARD AIR LINE RAILROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 1847.**

United States District Court
E. D. Virginia.

Argued Nov. 29, 1954.
Decided Dec. 10, 1954.

**130**

James B. McDonough, Jr., Norfolk, Va. (W. R. C. Cocke and Charles T. Abeles, Norfolk, Va., on the brief), for plaintiff.

Willard R. Memler, U. S. Dept. of Justice, Edward M. Reidy, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendants.

Richard B. Gwathmey, Wilmington, N. C., for intervenor, Atlantic Coast Line R. Co.

Before DOBIE, Circuit Judge, and HUTCHESON and HOFFMAN, District Judges.

DOBIE, Circuit Judge.

By this civil action, instituted in the United States District Court for the Eastern District of Virginia, Seaboard Air Line Railroad Company (hereinafter referred to as Seaboard), as plaintiff, sought a temporary and permanent injunction to restrain the enforcement of an order of the Interstate Commerce Commission (hereinafter called the Commission), dated July 30, 1954, issued in Docket No. 30882, Atlantic Coast Line Railroad Company (hereinafter called Coast Line) v. Seaboard.

By the terms of the order of July 30, 1954, as amended by order of October 11, 1954, Seaboard is required to join with Coast Line on or before January 15, 1955, in the establishment and maintenance of an interchange at Jacksonville, Florida, upon all traffic between points in Florida, on the lines of Seaboard South of Jacksonville, Florida, from and to which joint rates are presently in effect via Thalmann, Georgia, on the one hand, and points on the lines of Coast Line from Waycross, Georgia, to Atlanta, Georgia, and Birmingham, Alabama, and points on other lines North and West of Atlanta and Birmingham, on the other, at the joint rates and divisions presently in effect via Thalmann, Georgia, or such rates and divisions as may hereafter be lawfully established.

Both Seaboard and Coast Line have extensive trackage in the Florida peninsula. Both handle traffic moving to and from points in Florida South of Jacksonville and the Atlanta and Birmingham gateways and beyond. The traffic with which we are here concerned is only freight traffic originated or terminated in Florida by Seaboard. The principal gateways through which Seaboard moves freight traffic to and from points in Florida and the Atlanta and Birmingham gateways and beyond are Montgomery, Alabama, Vidalia, Georgia, and Columbus, Georgia. Seaboard does not inter-

change this traffic with Coast Line at Montgomery, Vidalia or Columbus.

The present interchange point for the traffic here involved, Thalmann, lies on a portion of the line of the predecessor of Coast Line, Atlanta, Birmingham & Coast Railroad which may be abandoned under authority granted in Atlantic Coast Line R. Co. Abandonment, Finance Docket No. 16872, decided December 18, 1950, 275 I.C.C. 810. Seaboard filed a petition to intervene in that proceeding which was denied. Coast Line's authority to abandon here is still valid. If this authority be exercised, an interchange point other than Thalmann would be necessary for the traffic here involved. Seaboard made an offer to Coast Line of Bladen, Georgia, as a proper exchange point, but Coast Line declined this offer. After weighing all possible advantages and disadvantages which might accrue at the various points, the Commission concluded that the service which could be afforded the traffic involved over new interchange facilities at Bladen would be less adequate, less efficient and less economic than that which could be furnished over existing interchange facilities at Jacksonville.

In substance, the questions presented to us are:

(1) Did the Commission's order of July 30, 1954, have the effect of establishing a new through route between the points named in the order?

(2) If the order of July 30, 1954, does have that effect, was it based upon adequate findings, which in turn, were supported by substantial evidence? These issues involve interpretation of the provisions of section 3(4) and section 15(3) and (4) of the Interstate Commerce Act, 49 U.S.C.A. §§ 3(4), 15(3, 4) (hereinafter called the Act).

We quote these provisions of the Act:

Section 3 "(4) All carriers subject to the provisions of this part shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this part or any common carrier by water subject to part III."

Section 15 "(3) The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers subject to this part, or by carriers by railroad subject to this part and common carriers by water subject to part III, or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated. The Commission shall not, however, establish any through route, classification, or practice, or any rate, fare, or charge, between street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business, and railroads of a different character. If any tariff or schedule canceling any through route or joint rate, fare, charge, or classification, without the consent of all carriers parties thereto or authorization by the Commission, is suspended by the Commission for investigation, the burden of proof

shall be upon the carrier or carriers proposing such cancelation to show that it is consistent with the public interest, without regard to the provisions of paragraph (4) of this section."

Section 15 "(4) In establishing any such through route the Commission shall not (except as provided in section 3, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. In time of shortage of equipment, congestion of traffic, or other emergency declared by the Commission, it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest."

Counsel for Seaboard, in oral argument before us, have freely admitted that if the amount of traffic now handled by it over its lines to the Northwest would remain as it now is, the substitution of Jacksonville for Thalmann as the interchange point for traffic over Seaboard and Coast Line, would be of little practical consequence. What Seaboard fears is that a large amount of this traffic over its lines to the Northwest from Florida would, by the substitution of Jacksonville for Thalmann as the exchange point, be diverted to Coast Line. The realization of this fear would unquestionably be economically detrimental to Seaboard and correspondingly advantageous to Coast Line.

The Commission is, of course, a group of highly skilled, technical experts, primarily charged with the enforcement of the Act. A strong presumption, therefore, exists in favor of the correctness of its decisions in its limited field. A heavy burden, accordingly, rests on a litigant that asks a court to enjoin the enforcement of an order of the Commission. The approach and viewpoint of the courts in cases such as the instant case before us have been clearly manifested in a long line of judicial decisions. Said Mr. Justice Cardozo, in Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260:

"The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. In this instance the care and patience with which the Commission fulfilled its appointed task are plain, even to the casual reader, upon the face of its report."

We think the second sentence of this quotation is peculiarly applicable to the instant case.

See, also, Interstate Commerce Commission v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051; Badgett v. United States, D.C., 123 F.Supp. 62; Norfolk Southern Bus Corp. v. United States, D.C., 96 F.Supp. 756.

 Another classical statement of the scope of judicial review accorded Commission orders is found in Interstate Commerce Commission v. Union Pacific Railroad Co., 222 U.S. 541, 547–548, 32 S.Ct. 108, 111, 56 L.Ed. 308, wherein Mr. Justice Lamar stated:

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Illinois Cent. R. Co. v. I. C. C., 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128. Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

See, also, Rochester Telephone Corp. v. United States, 307 U.S. 125, 139–148, 59 S.Ct. 754, 83 L.Ed. 1147; Riss & Co. v. United States, D.C., 100 F.Supp. 468, affirmed 342 U.S. 937, 72 S.Ct. 559, 96 L.Ed. 697.

 Coming to the first of the questions raised in this case, we cannot overturn the finding of the Commission that the order of July 30, 1954, did not create a new "through route" as that term is used in the Act. The statutory term "through route" used throughout the Act has been thus defined by the Supreme Court in Thompson v. United States, 343 U.S. 549, 556, 72 S.Ct. 978, 982, 96 L.Ed. 1134:

"'A "through route" is an arrangement, express or implied, between connecting railroads for the continuous carriage of goods from the originating point on the line of one carrier to destination on the line of another. Through carriage implies a "through rate." This "through rate" is not necessarily a "joint rate." It may be merely an aggregation of separate rates fixed independently by the several carriers forming the "through route"; as where the "through rate" is "the sum of the locals" on the several connecting lines or is the sum of lower rates otherwise separately established by them for through transportation. *Through Routes and Through Rates*, 12 I.C.C. 163, 166.'"

The Court then quoted from the Commission's summarization of its decision in *Through Routes and Through Rates*, supra, as stated in its 21st. Annual Report to Congress:

"A through route is a continuous line of railway formed by an arrangement, express or implied, between connecting carriers * * * Existence of a through route is to be determined by the incidents and circumstances of the shipment, such as the billing, the transfer from one carrier to another, the collection and division of transportation charges, or the use of a proportional rate to or from junction points or basing points. These incidents named are not to be regarded as exclusive of others which may tend to establish a carrier's course of business with respect to through shipments."

Following this, the Court gave its version of the test of the existence of a through route as being "whether the participating carriers hold themselves out as offering through transportation service. Through carriage implies the

existence of a through route whatever the form of the rates charged for the through service." In other words, it is the through service offered by the carriers which is emphasized. In the instant case, through transportation service between Coast Line and Seaboard has been in existence for a number of years between the points involved in the Commission's order, via Thalmann. The joint rate established by the Commission in its order affects the same service between the same origin and destination points on those carriers' lines. It seems clear, in keeping with the definition of a through route cited in the Thompson case, supra, i. e., a " 'continuous carriage of goods from the originating point on the line of one carrier to destination on the line of another' ", that no new "through route" has been established. The essential features of the old through route still prevail. There has been a change only in a minor detail, namely, the substitution of Jacksonville as the interchange point in place of Thalmann. Jacksonville had been utilized as an interchange point for other traffic between the same carriers for many years.

The situation before us is distinguishable from that which arose in the Thompson case, supra. There, the Supreme Court ruled a through route was not in existence over the lines of the Missouri Pacific ·and the Burlington to the ultimate destination, Omaha, Nebraska, because the Missouri Pacific offered through service with the Burlington only via Concordia, Kansas, to Lenora, Kansas and points short of Omaha, and there was no evidence that any shipment had ever been made from Lenora to Omaha via the Burlington line, or that the carriers had ever offered through service over that route. In our case it has been the accepted practice of the Coast Line and Seaboard to perform through service from the origin to destination points described in the Commission's order.

■ In essence, the requisite and vitally important components of the original through route under the new arrangement will still be intact—the

holding out by the carriers involved and the actual transportation of traffic at a through rate from and to the same origin and destination points described in the Commission's order. Thus, the origin and destination territories and the freight rates and divisions remain the same regardless of the junction at which the traffic is to be interchanged. It is a familiar maxim that the law does not require a vain or useless thing.

Technically, what is involved here is not the establishment of a new "through route" in the statutory sense. The through route is already in effect via Thalmann, and all that is being done is to establish a new point of interchange in lieu of Thalmann. The only change in that through route occurs in the segment of the route between Baldwin, Florida, and Sessoms, Georgia. Instead of being handled as at present by Seaboard to Thalmann, thence Coast Line to Sessoms, the Northbound traffic would be handled by Seaboard to Jacksonville, thence Coast Line to Sessoms, and instead of being handled by the Coast Line from Sessoms to Thalmann, the Southbound traffic would be handled by Coast Line from Sessoms to Jacksonville, and thence Seaboard. In short, the new arrangement provides practically for the movement over a single side of a rather short triangle, instead of, as before, over two sides of this triangle. The traffic involved is through overhead traffic and would not be affected by the shift of the interchange point. No intermediate traffic would be affected. No change would be made in the participating carriers. No change would be made in the existing divisions. There would be no change in the joint through rates now applicable on the traffic via Thalmann. The matter involved is simply a readjustment of the interchange facilities for the continued operation of an established joint interline service between Coast Line and Seaboard.

If the position of the Commission be sound, that its order did not establish a new "through route", then section 15 (4) of the Act would have no application,

and the necessity of making findings by the Commission appropriate to clauses (a) and (b) thereof would be eliminated. United States v. Great Northern Ry. Co., 343 U.S. 562, 575, 72 S.Ct. 985, 96 L.Ed. 1142.

If, however, we assume that the Commission's order does establish a new "through route" under the Act (though, as has been indicated, we think otherwise) the order can be sustained on the ground that the Commission made findings, based on substantial evidence, which permit the establishment of a new "through route" under clauses (a) and (b) of Section 15(4) of the Act.

From the Report of the Commission on Further Hearing, Division 3, we quote:

"By section 15(4) we are forbidden to require any carrier, without its consent, to embrace in a through route substantially less than the entire length of its line between the termini of such through route, unless the carrier's own line is unreasonably long or the route proposed is needed in order to provide adequate, and more efficient or more economic service. The defendant does not attempt to show that its own line between south Florida and Atlanta and Birmingham would not be unreasonably long as compared with the Seaboard-Coast Line route. We find that it would be unreasonably long as compared with the Seaboard-Coast Line route with interchange at Jacksonville.

"It is clear that the Seaboard-Coast Line route through Jacksonville would be substantially superior to routes presently in use. In the prior report, the division found, at page 676:

"We think, also, that the circumstances here present may reasonably be considered as falling within exception (b) of section 15(4), since the proposed route through Jacksonville is clearly needed in order to provide adequate, and more efficient and more economic, transportation.

"That finding is fully warranted by the evidence, and it is affirmed. We further find that the route through Jacksonville is necessary and desirable in the public interest.

"Moreover there is here involved not merely a choice between routes embracing long portions of the Seaboard's line and another route embracing substantially less of that carrier's line, but also competition between the Coast Line's route and numerous other routes embracing lines connecting with the Seaboard, all of which embrace substantially less than the long portions of the Seaboard's line embraced in other established routes. The defendant is obligated, under section 3(4) of the act, to provide reasonable and proper facilities for the interchange of traffic at an interchange point in lieu of Thalmann, with due regard for the public interest. The record is convincing that the obligation thus placed upon the carriers affected can be met only by using Jacksonville as the interchange point on the traffic described.

"We conclude that interchange of the traffic described between the complainant and the defendant at Jacksonville is required to afford reasonable and proper facilities for the interchange of such traffic, in the public interest, and that provision should be made therefor at the joint rates and divisions presently in effect via Thalmann, or as such rates or divisions may be lawfully modified."

It will thus be seen that the Commission has found grounds for its order (even if it be conceded that the order establishes a new "through route") under both (a) and (b) of Section 15(4) of the Act. And either (a) or (b) is sufficient.

As to the Commission's finding under (a) above, the most convincing evidence, though there was other testimony, as to the comparative lengths of Seaboard's lines to and from Florida and Atlanta

and Birmingham and the Seaboard-Coast Line's lines, with interchange at Jacksonville, is a glance at the maps showing these lines.

■ And we cannot say that the finding under (b) (above) that "the route through Jacksonville is necessary and desirable in the public interest," lacks the support of substantial evidence in the record. Though the Commission found "There is no convincing evidence that a shifting of the interchange point from Thalmann to Jacksonville would materially change the competitive picture", Seaboard's clearly expressed fears of the result of this new interchange point contain at least an implication that the change of interchange points would be in the public interest and would afford more efficient transportation. The mere fact that an order of the Commission adversely affects the 'economic interest of a carrier is, of course, no ground for denying the validity of the order.

There was evidence that for many reasons Jacksonville rather than Thalmann was the most logical and reasonable interchange point for the traffic in question, and that the substitution of Jacksonville for Thalmann would not only protect existing schedules but would further serve to improve these schedules, particularly as to perishable goods. Evidence indicated, too, that the present facilities at Jacksonville are adequate to handle the interchange there of traffic between Seaboard and Coast Line and would provide the most efficient and economical service.

Coast Line, in its brief, frankly admits that the shippers who testified before the Commission "were not particularly concerned with the point of interchange" but that they "urged the retention of through interline service between Seaboard and Coast Line comparable with the existing service." The instant case, however, involves no shipper complaints; rather is it an operational dispute between two competing carriers. And, rather clearly we think, the operational evidence here supports the Commission's findings as to the way the public interest points. There was, for example, evidence that the nature of the terrain and the building conformation permitted higher speeds on the Jacksonville line than on either the Brunswick or the Sessoms line. And, again, the information gleaned from an inspection of the railroad maps submitted to us is of real importance.

For the reasons stated, we must deny the prayer of Seaboard for a temporary or permanent injunction against the enforcement of the order of the Commission. The instant civil action of Seaboard must, accordingly, be dismissed.

Action dismissed.