**CHICAGO & EASTERN ILLINOIS RAIL-ROAD COMPANY, an Indiana corporation, Plaintiff-Appellant,**

v.

**SOUTHERN RAILWAY COMPANY, a Virginia corporation, et al., Defendants-Appellees.**

No. 12354.

United States Court of Appeals Seventh Circuit.

Dec. 2, 1958.

Rehearing Denied Jan. 12, 1959.

Frank F. Vesper, Chicago, Ill., Frederick P. Bamberger, Evansville, Ind. (Patrick C. Mullen, Chicago, Ill., on the brief), for appellant.

William T. Fitzgerald, Evansville, Ind., James A. Bistline, Washington, D. C., for appellee.

Before DUFFY, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Chicago & Eastern Illinois Railroad Company, herein also called plaintiff, has appealed from that portion of a judgment entered by the district court which dismissed its amended complaint (for the period subsequent to August 1, 1944), and allowed a recovery (for the period from August 1, 1944 through May 31, 1957), by defendants from plaintiff of $132,151 on defendants' amended counterclaim. This case was tried by the court without a jury.

Plaintiff's amended complaint sought recovery of sums collected by defendants on freight shipments originating on plaintiff's lines "since 1940" which were delivered by plaintiff to Southern Railway at Princeton, Indiana, for transportation to final destinations on the lines of defendants, or its connections, which sums it is alleged defendants withheld from plaintiff which is entitled to them.

By defendants' amended counterclaim they sought recovery from plaintiff of sums collected by it on northbound shipments from points on defendants' lines, moving via defendants' lines to Princeton, Indiana, and thence to final destination on lines of plaintiff or its connections.

No question as to the pleadings, including responsive answers and replies, has been raised.

As far as here involved, a line of plaintiff's railroad extends from Chicago, Illinois, through Princeton, Indiana, to Evansville, Indiana, while defendants' lines extend from Princeton, Indiana and Evansville, Indiana, via Louisville, Kentucky, to Birmingham, Alabama and other southern points. For example, a consignor at Chicago may execute one bill of lading to plaintiff, covering a freight shipment from Chicago to Birmingham,

and the shipment will be delivered at Birmingham by defendants without the consignor or consignee taking possession of the shipment at the junction point of either Princeton or Evansville. To compensate the railroads for such services, an allocation of the freight charges received is required. This allocation depends upon either (1) a combination of the local rates, if there be no joint through rate, (2) a type of through rate involving proportional rates, which contemplates that either the originating carrier or the destination carrier may have a lower rate applicable to or from the junction point which differs from its local rate but applied only if the traffic moves *from* points beyond, or *to* points beyond, the junction point,[1] or (3) joint through rates or joint rates.

Generally, the charges, which the shipper or receiver must pay to cover the through transportation, are submitted and paid as one bill. In the case of a combination rate, (to use an example) if the rate on pig iron from Chicago to Evansville via plaintiff's line is $1.00 and from Evansville to Birmingham via defendants' lines is $2.00, the total charge would be $3.00 and the plaintiff would receive $1.00 and defendants $2.00. In the case of a proportional rate,[2] assuming plaintiff has a $.90 rate on pig iron from Chicago to Evansville applying only if the pig iron moves beyond Evansville, this rate added to defendants' rate from Evansville to Birmingham, would make a through charge of $2.90, which would be divided $.90 to plaintiff and $2.00 to defendants.

In the case of a joint through rate or joint rate agreed upon by the carriers for the entire movement from Chicago to Birmingham, where plaintiff and defendants had agreed upon a through charge of $2.85, it is customary for the parties to the rate to agree on the share each is to receive for its services, since there is no natural basis for dividing the charges as there is in the case of combination charges or proportional charges. One method, as an example, is to prorate the total charges on the basis of the local rates to and from the junction point. In the example discussed, where plaintiff's local charge was $1.00 and defendants' $2.00, prorating a joint through rate or joint rate of $2.85 on that basis would give plaintiff 1/3 of $2.85 or 95 cents and defendants 2/3 of $2.85 or $1.90. The respective proportions to be received under joint through rates are known as divisions of joint rates or merely as divisions.[3]

The divisions of joint through rates on shipments moving both north and south of the Ohio River are a result of the historical development of rail transportation, in the early stages of which much traffic began or ended at the River. The rates were usually made in view of that fact. When traffic began to move all rail *in continuous movement both north and south of the River*, the combination of the rates to and from the River were generally used as the rate basis. As joint through rates developed, the divisions of the rates were generally made over the Ohio River crossings. Division of Rates, Official and Southern Territories, 234 I.C.C. 175, 179. When joint through rates covering the entire movement were established on shipments moving both north and south of the Ohio River, the divisional agreements usually would provide that the primary division of the rate would be made at the Ohio River, and the portions north of, and south of, the River would be divided in accordance with the local divisions of rates from origin to the Ohio River crossing. This procedure contin-

---

1. Under such a rate each carrier would be entitled to that part of the through rate based upon the service performed upon its own line.

2. As to proportional rates, see Hocking Valley R. Co. v. Lackawanna Coal &

Lumber Co., 4 Cir., 224 F. 930, 931 and 13 C.J.S. Carriers § 300, p. 691.

3. See United States v. Great Northern Ry. Co., 343 U.S. 562, 566, 72 S.Ct. 985, 96 L.Ed. 1142, note 2.

ued, even though subsequently a railroad operating on one side of the Ohio River later acquired or constructed a line of railroad on the other side of the River.

Against this basic historical background, defendants operate a system of railroad extending both north and south of the River, crossing it at one point, Louisville, Ky., and reaching another Ohio River crossing, Evansville, Indiana, where they do not cross the River, but where they do connect with plaintiff's line. In addition, a line of defendants' running from Louisville to St. Louis, Missouri, crosses plaintiff's line at Princeton, Indiana. Plaintiff's line meets the lines of Louisville & Nashville Railroad Company and the Illinois Central Railroad Company at Evansville, and those railroads operate south of the Ohio River from Evansville. Thus, if plaintiff has a carload of freight originating at a point on its line of railroad, destined for Birmingham, Alabama, it can haul that shipment to Evansville, going through Princeton, and turn it over to the Louisville & Nashville Railroad or the Illinois Central Railroad, both of which railroads have lines extending to Birmingham. In that case, plaintiff will receive the entire division of the rate belonging to the carriers handling the traffic north of the Ohio River. Plaintiff contends that, to be on a competitive basis, defendants for a long time have given the same division at Evansville to the roads from the north bringing the traffic to Evansville as do the other southern railroads, even though they carry the shipment north of the Ohio

River to Louisville where it crosses the River; in other words, that defendants have treated Evansville, for divisional purposes, as an Ohio River crossing even though they do not cross the Ohio River there.[4]

According to plaintiff's theory, it was because of the above facts that the parties hereto made an agreement on September 14, 1916, providing:

"In dividing rates from stations on the Chicago and Eastern Illinois R.R. to points on Southern Ry. and connections south of the Ohio River, when moving via Princeton, Ind., and Southern Ry., the C&EI RR will receive north of Princeton or Oakland City, Ind., local or proportional rates, or divisions of through rates as authorized as applying north of Evansville, Ind."[5]

Plaintiff contends that this agreement is still in effect. Defendants deny this.

On January 3, 1931, the Interstate Commerce Commission instituted an inquiry and investigation which culminated in a report, 234 I.C.C. 175, July 25, 1939, Docket No. 24160, in which the commission found that the "basing of divisions on river crossings or other so-called territorial gateways at which no actual interchange takes place rests upon a fiction which the railroads have sometimes employed in their own divisional agreements, but we see no good reason for perpetuating it." In finding 5, it directed

" * * * The territorial gateways or dividing points to be used * * * shall be the points at which the traffic is actually inter-

4. Defendants' line to Evansville branches off of their line that runs from Louisville to St. Louis. Thus, a shipment turned over to defendants at Evansville would have to move over a branch line to the main line and then be placed on a main line train and taken to Louisville, whereas a shipment taken at Princeton would be placed on a through train and moved to Louisville directly. Thus, if plaintiff did not turn the traffic over

to defendants at Princeton and take less revenue, defendants were put to additional expense in handling the traffic.

5. This 1916 agreement did not apply to certain northbound traffic from defendants' lines to destinations on plaintiff's lines and its connections. Certain northbound commodities were covered by subsequent agreements, under which plaintiff is the collecting carrier.

changed between an official and a southern carrier. * * * "

By its supplemental report on reconsideration, April 1, 1940, 238 I.C.C. 149, Docket No. 24160, the commission stated that the southern lines had urged that the commission's basis should not be used in determining primary divisions to and from, *inter alia,* a number of points north of the Ohio River in Indiana where traffic is interchanged between northern and southern lines. The commission said that its

" * * * findings need not, and should not, be interpreted as requiring the use of these places in determining the prescribed primary divisions. It may be that the parties can agree as to the divisions to be used on traffic which is interchanged at such points in the light of our findings, but if not, the disagreement can of course be submitted to us for adjudication."

On June 28–29, 1944, there was held at Roanoke, Virginia, a joint conference of representative carriers in Official Territory (including Illinois Freight Association) and carriers in Southern Territories. Plaintiff was represented by H. R. Wilkinson, its general freight agent, and defendants were represented by L. V. Crane, their freight traffic manager. L. E. Butler was general chairman of the conference. This conference resulted in what is known as the Roanoke Agreement, dated June 29, 1944. It expressly covers "Divisions of Rates Between Official (including Illinois Freight Association) and Southern Territories involved in I.C.C. Docket 24160 Via So-Called Interior Junctions." The Roanoke Agreement recites that the conferees,

" * * * acting through their respective duly authorized committees, in order to compose disputes arising from the application of the decision of the Interstate Commerce Commission in Docket 24160, Official-Southern Division Case, as to traffic interchanged at so-called interior junc-

tions in * * * Indiana, * * * agree upon the plan hereinafter set forth as a compromise of differences in views respecting divisions of rates on the involved traffic.

* * * * * *

"Section II. Traffic Moving Between Points On Railroads In Central Freight Association, Illinois Freight Association, * * * Territories And Points On Railroads In Southern Territory * * *.

"On Traffic As Described In This Section II Interchanged At Interior Junctions In * * * Indiana Between Northern And Southern Carriers.

"Rates will be divided over the Ohio River Crossing (as named in Item 10 of Volume 1 of SFTB DB 405) through which the traffic moves, using I.C.C. Docket 24160 factors north and south of said Ohio River Crossing applied to the short line distances north and south thereof via routes over which carload traffic can move without the necessity of transfer of lading.

"The proportions north of the Ohio River Crossing will be subdivided as follows:

"(a) Where the same southern carrier hauls the traffic north and south of the Ohio River Crossing through which the traffic moves, said southern carrier will accept in subdivisions north of the Ohio River revenues based 10% less when to and from Central Freight Association territory and 8% less when to and from Illinois Freight Association territory than its local percents to or from said Crossing. * * *

"(b) In the subdivisions of the proportions north of the Ohio River Crossings as specified in Section II, Paragraph (a) hereinabove, where reference is made to a percentage deduction based on local percents it means that where this allows greater percents north of the Ohio River

Crossing to the southern line which hauls the traffic both north and south of the Ohio River Crossing than the use of the present proportional percents, if any, such proportional percents will apply without a percentage deduction.

\* \* \* \* \* \*

"Section X. Effective Date.

"The parties hereto agree to the prompt amendment of SFTB DB 405 in accordance with the principles of this Agreement in time to make same applicable with August 1944 interline accounts or as soon thereafter as reasonably possible, \* \* \*

"This Agreement is entered into at Roanoke, Va., June 29, 1944.

For the Official Territory (including Illinois Freight Association) lines by their authorized Committee consisting of:

> J. C. McGoran
> Wm. Fitzgerald
> H. R. Wilkinson\*
> R. O. Small
> R. B. Battey
> J. P. Patterson
> O. W. Cox
> W. McL. Pomeroy

By (Signed) L. E. Butler
L. E. Butler, Chairman, Official Territory (including Illinois Freight Association) Lines' Committee

For the Southern Territory lines by their authorized Committee consisting of:

> J. E. Tilford
> J. L. Sheppard
> L. V. Crane\*
> R. T. Etheridge
> L. L. Doss
> K. G. Gottschaldt

By (Signed) J. G. Kerr
J. G. Kerr, Chairman, Southern Territory Lines' Committee."

———◆———

Subsequently the Interstate Commerce Commission discussed the Roanoke Agreement, 287 I.C.C. 527, 528, January 12, 1953, Docket No. 29885,[6] and in 289 I.C.C. 4, May 26, 1953, Docket No. 29885.

Certain exhibits, embodied in plaintiff's exhibit 3, offered and rejected by the district court, show:

(1) On July 21, 1944, plaintiff's conferee Wilkinson wrote to general chairman Butler, complaining that the report of the conference proceedings was not in complete accord with Wilkinson's understanding of what transpired at the conference. He said, *inter alia*,

" \* \* \* Mr. J. E. Tilford of the L&N R.R. offered a recommendation which was approved (C&EI R.R. voting in the negative) to the effect that no specific application or exception for any individual line would be shown in the proceedings. No mention of this recommendation is named in the copy of the proceedings which I have, but regardless of this recommendation, we note that on Page 7 under Exception 2, there is

\* (Italics supplied.)

6. The Commission said:
"\* \* \* In 1944 an agreement was entered into by the interested lines, under which the Ohio River cities were treated as primary dividing points for all traffic which passed through them over southern lines without interchange, but it was provided that in lieu of using local divisional bases in subdividing the northern primary division for the service to and from an interior point of interchange, 10 percent should be deducted from the local prorating factor for the southern line and added to that of the northern line. This agreement applies only with respect to rates to and from central territory \* \* \*."

an individual exception for account of the Santa Fe Ry. and CRI&P Ry.

"We would like to have you amend the proceedings to correctly show recommendation which was offered by Mr. J. E. Tilford and which was approved, representative of the C&EI R.R. being the only one voting in the negative, and as it is definitely a part of the proceedings and a very important part insofar as the C&EI R.R. is concerned, we must insist that the proceedings be amended to show this recommendation which was approved by the majority. The proceedings should also show that the C&EI R.R. representative noted an exception to this majority recommendation.

"In conclusion, in order that the record may be clear insofar as traffic from and to points on the C&EI R.R. is concerned, there is no agreement modifying the present basis for subdividing the proportions accruing north of the Ohio River on traffic which is interchanged at Princeton, Ind."

(2) On July 22, 1944, J. B. Ford, plaintiff's vice-president, wrote to general chairman Butler, saying, *inter alia,*

" * * * The representatives of the C&EI R.R. and Southern Ry. present at the Roanoke meeting were unable to reach an agreement and C&EI R.R. representative noted an exception to that portion of the record providing that no specific application or exception for any individual line or lines would be shown in the record.

"Therefore, until such time as different divisional arrangements are agreed upon between the Southern Ry., on the one hand, and C&EI R.R. on the other, the arrangements in effect prior to the Roanoke Conference must be continued in effect, namely,

to divide the revenue on traffic interchanged at Princeton, Ind., * * * We will expect the Southern lines to respect this agreement between the C&EI R.R. and Southern Ry. until changed by mutual agreement.

"This letter is written for the purpose of clearing the record made at the Roanoke Joint Conference."

(3) On July 28, 1944, general chairman Butler wrote to Mr. Wilkinson, in part,

"According to the stenographic minutes of the meeting, Mr. Tilford's motion was to the effect that no exceptions of individual carriers should be set forth in the proceedings, which motion was approved by a majority. * * * "

■ Plaintiff contends that the district court erred in excluding the foregoing parts of plaintiff's exhibit 3,[7] as well as certain testimony of Butler. By this excluded evidence, plaintiff says it attempted

" * * * to show that the conferees did not have before them modification of specific agreements covering divisions at particular junctions but only the question of what basis of reduction in the usual basis of divisions, absent special agreement, should be made to conform to the intent of the Commission in Docket No. 24160. * * * that the negotiators for the northern carriers were not authorized to change the plaintiff's divisions, and that the plaintiff's representative made clear to the conference that he was not agreeing to any change in the special basis applicable via Princeton between defendants and plaintiff. Plaintiff also sought to show other conditions and circumstances surrounding the Roanoke Agreement and its application and to explain its

7. We call attention to the fact that plaintiff's failure to include in its appendix filed in this court said parts of its exhibit 3, pursuant to our rule 16(b), 28 U.S.C.A., would justify our refusal to

consider the alleged error involved. However, we have resorted to the transcript of record to ascertain the contents of the rejected documentary evidence.

terms which are not clear and complete on the face. \* \* \* "

■ The Roanoke Agreement was signed on behalf of *plaintiff* as well as defendants. We are satisfied that it was the intention of the carriers entering into that agreement to determine therein, *inter alia,* the divisions on traffic interchanged at all the interior gateways, including Princeton, Indiana. The history culminating in the Roanoke Agreement, the heading of which refers to the purpose of the conferees to compose disputes as to traffic interchanged at the so-called interior junctions in Indiana *inter alia,* amply supports our conclusion. We, therefore, hold that the Roanoke Agreement clearly includes the subject matter in dispute in this case, and that it supersedes the 1916 agreement between plaintiff and defendants, as subsequently amended.

The correctness of this conclusion is emphasized by plaintiff's unsuccessful effort to introduce evidence in an effort to strike down the relevant parts of the Roanoke Agreement. It is obvious that, having joined in the conference which produced the Roanoke Agreement, plaintiff could not vitiate in part the proceeding which had culminated in the execution of the agreement. It is elementary that, having entered into the agreement, plaintiff is bound by it in its entirety. It is significant that plaintiff did not ask the district court, by way of equitable relief, to set aside or reform the agreement on the ground of fraud, accident or mistake.

■ As to plaintiff's contention that the terms of the Roanoke Agreement are not clear and complete on its face, we fail to find that the agreement is subject to this criticism. In presenting its contention, plaintiff asks three questions:

(1) What is Central Freight Association territory or Illinois Freight Association territory?

(2) What is a local percent?

(3) What is a proportional percent?

and asserts that the Roanoke Agreement was not

" \* \* \* self-executing but was to become effective only upon publication of certain division sheets \* \* \* ."

and further that there is in the record no proof of the performance of "this condition precedent".

It should be remembered that the conferees who drew up this agreement were selected by the railroads involved and were undoubtedly versed in the usages and language employed in the subject of railroad rates. We have a right to infer that they understood the language which they embodied in the agreement, even though the words employed might not, without added definition, convey a clear meaning to persons not versed in the subject matter of the conference. Moreover, it is significant that in the letters which are a part of plaintiff's exhibit 3, *supra,* no contention was made by plaintiff that the agreement lacked clearness or completeness.

We now deal specifically with plaintiff's aforesaid attacks upon the agreement.

As to (1), the frequent references in the record to the terms "Central Freight Association territory" and "Illinois Freight Association territory" convince us that persons engaged in the railroad business know the boundaries of these territories.[8]

As to (2) and (3), the phrases "local percent" and "proportional percents" are obviously phrases used by persons familiar with rates, tariffs and divisions. Moreover it is particularly significant that in the belated attempts by plaintiff's officials to challenge the Roanoke Agreement, no suggestion was made that they did not understand its terms.

As to (4), it is our opinion that the publication of division sheets was not re-

8. Section VIII of the agreement reads: "Description of Northern Territories. Where reference is made to Central Freight Association, Illinois Freight Association \* \* \* territories, those territories will be described in Agent B. T. Jones' Territorial Directory 3–H, I.C.C. 3784, or reissues thereof."

quired to make the Roanoke Agreement effective, but that these sheets are merely a practical method of enabling division clerks to understand the terms of divisional agreements. In Section X of the Roanoke Agreement there is a provision that the parties agree to prompt amendment of

"SFTB DB 405 in accordance with the principles of this Agreement in time to make same applicable with August 1944 interline accounts or as soon thereafter as reasonably possible, and that on and as of the effectiveness of the amendment of SFTB DB 405 the March 28, 1941 Agreement shall terminate, except as provided in Section IX above. Where reference is made to Item 10, Volume I of SFTB DB 405, it will include necessary amendment conforming with this Agreement."

This means that the parties will take necessary steps to put the agreement into operation.

 We hold that the district court did not err in excluding parts of plaintiff's exhibit 3. As to Butler's testimony, which was stricken by the district court, we find that only once in its brief does plaintiff refer to that testimony. It fails to point out any part thereof upon which it seeks to rely. We find that his testimony, which was by deposition, covers 14 pages of the transcript of the trial court proceeding. It is not our duty to make a search thereof in order to support the point made by plaintiff's counsel in its brief.

 The court excluded from evidence plaintiff's exhibit 4. That action is challenged by plaintiff in this court. However the proffered exhibit was not preserved in the record filed by plaintiff in this court and we are therefore unable to rule upon its admissibility. Smith v. S. S. Kresge, 8 Cir., 79 F.2d 361, and Drake v. General Finance Corp., 5 Cir., 119 F.2d 588, 589.

For the first time in this case, plaintiff argues in its brief that the Roanoke Agreement must be construed, if possible, in such a manner as to avoid finding that it was a violation of the laws of the United States referring to "Antitrust Laws". They say that the Roanoke conference was a price-fixing conference among competitors and, as such,

"* * * would have been in violation of the Anti-trust laws of the United States (15 U.S.C. § 1 et seq.), unless exempted therefrom. * *"

 It is a general rule that a litigant cannot raise in a court on appeal a point not raised in the lower court. We have searched the record and find that the effect of the antitrust laws was in no way called to the attention of the district court. Neither by its pleadings, tendered findings of fact or propositions of law, or in any other way, did plaintiff raise this question in the district court. For that reason it is not properly before us.

For the reasons herein set forth, the portion of the judgment from which this appeal has been taken, is affirmed.

Affirmed.