**UNITED STATES of America,**
**Appellee,**

v.

**John Joseph DiTOMMASO,**
**Appellant.**

**UNITED STATES of America,**
**Appellee,**

v.

**Charles Forest WAUGAMAN,**
**Appellant.**

**Nos. 11942, 11952.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 8, 1968.

Decided Dec. 2, 1968.

Certiorari Denied March 24, 1969.
See 89 S.Ct. 1209, 1210.

Stephen D. Shawe, Asst. U. S. Atty., Baltimore, Md., Stephen H. Sachs, U. S. Atty., Paul R. Kramer, Asst. U. S. Atty., Baltimore, Md., for appellee.

Donald F. Rogers, Baltimore, Md., for appellant, DiTommaso.

Arnold M. Weiner, Baltimore, Md., for appellant, Waugaman.

Before BOREMAN, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

In No. 11,942 John Joseph DiTommaso, convicted and sentenced for conspiracy and counterfeiting, appeals solely on the ground that the grand jury which indicted him was illegally constituted. He

argues that the indictment returned against him should have been dismissed.

In No. 11,952, Charles Forest Waugaman, convicted and sentenced for bank robbery, appeals, *inter alia*, on the ground that the grand jury which indicted him and the petit jury which found him guilty were selected in violation of the statutory and constitutional standards prescribed for the selection of jurors. On appeal Waugaman also asserts other errors in his trial.

Both appeals are from the District of Maryland and both defendants were parties to the proceeding United States v. Cohen, 275 F.Supp. 724 (D.Md.1967), which examined and upheld the validity of the manner of selection of grand and petit jurors in that district and sustained the legality of the grand juries which indicted defendants and the petit jury which found Waugaman guilty.[1] We consolidated the appeals for argument and decision. We affirm in both cases.

## I

The manner of selecting jurors to serve on the grand and petit juries in the District of Maryland is fully set forth in United States v. Cohen, supra, to which reference is made for a fuller statement of the facts. Questionnaires to prospective jurors were sent to persons, the names of whom were (a) supplied by "key men" personally known to the clerk or the Jury Commissioner, (b) obtained by the clerk from such sources as telephone directories, city and county directories, and membership lists of clubs and civic groups, and (c) obtained by the clerk from "key men," such as ministers, priests and rabbis, state officials, county court clerks, registers of wills, supervisors of elections and labor leaders, not personally known to the clerk. The names of qualified persons, not excused under blanket excuses (doctors, lawyers, dentists, nurses, school teachers and the physically disabled), were deposited in the jury box from which periodic drawings were made. The names of 35%–40% of the names deposited were obtained from source (a); 20%–25% from source (b); and 35%–45% from source (c). From each particular drawing and after a summons to the person whose name was drawn and a judicial determination of the validity of any excuse asserted, the grand jury and petit jury panel for each term of Court was named.

As a beginning point for our discussion of the issue to be decided, it is appropriate to state what is not in issue. It is conceded that the clerk and the Jury Commissioner did not practice intentional exclusion as to race, color, sex, age, economic status, political affiliation, or any other measure by which jurors may be classified. It is undisputed that over the five-year period preceding the hearing in the district court the percentages of representation of prospective jurors, before excuses, by race, religion and political affiliation were identical to or very closely approximated the like percentages of the population within the district eligible for jury service.

Stripped to their essentials, defendants' contentions are that the jury selection process in the District of Maryland resulted, albeit unwittingly, in systematic exclusion by sex, age, geography, economic status (occupation) and education. The factual basis of defendants' contentions is shown by the following summary of statistical studies of twenty-one grand juries[2] empaneled between 1961 and

1. Both defendants were indicted by the December Term, 1966, grand jury. Waugaman was convicted by a petit jury chosen from the March Term, 1967, panel of petit jurors. It should be noted that the method of selecting grand and petit jurors in the District of Maryland, considered in United States v. Cohen, will be abandoned in December, 1968. Thereafter, jurors will be selected in accordance with the Jury Selection and Service Act of 1968. P.L. 90-274, 82 Stat. 54, 28 U.S.C. § 1861 et seq.

2. Since petit juries were selected by the same process by which grand juries were selected, Waugaman relies on these figures in arguing that the petit jury which convicted him was unrepresentative.

1966, which the parties stipulated as agreed exhibits, or which were proven at the hearing on motions to dismiss the indictments.[3]

| Category | % of Population Eligible | % of Jurors Drawn | % on Defendants' Grand Jury |
|---|---|---|---|
| **I. Sex** | | | |
| A. Men | 47.9 | 71 | 72.5 |
| B. Women | 52.1 | 29 | 27.5 |
| **II. Age** | | | |
| A. 21–29 | 18.9 | 3.9 | 2.5 |
| B. 30–39 | 25.3 | 16.8 | 20.0 |
| C. 40–49 | 22.0 | 26.7 | 30.0 |
| D. 50–59 | 16.1 | 28.4 | 22.5 |
| E. Over 59 | 17.7 | 24.2 | 25.0 |
| **III. Geography** | | | |
| A. Dist. of C. Suburbs (Montg.–Prince George's Counties, Maryland)* | 23.3 | 1.6 | 5.0 |
| B. Elsewhere in Md. | 76.7 | 98.4 | 95.0 |

C. Metropolitan Baltimore Area—Of 870 grand jurors drawn during the five-year period in question, 591 were from the Baltimore Metropolitan Area. Of the 591, 185 (or, roughly ⅓) were residents of *four* postal zones in the northern part of the city and the southern part of Baltimore County. These four postal zones have a total population of 196,000. The remainder (406) were residents of *nineteen* postal zones in the south and east (Baltimore City, Baltimore County and Anne Arundel County) having a total population of 752,000.

| Category | % of Population Eligible | % of Jurors Drawn | % on Defendants' Grand Jury |
|---|---|---|---|
| **IV. Economic Class** | | | |
| A. Executive and professional ** | 25.0 | 45.7 | Not given |
| B. Blue collar ** | 48.0 | 24.7 | Not given |
| C. Executive and professional *** | 15.4 | 34.5 | 33.3 |
| D. Blue collar *** | 29.3 | 18.6 | 15.4 |
| **V. Education** | | | |
| A. Less than high school diploma | Over 50 | 24 (33%· for petit jury) | 21.9 |
| B. High school diploma or more | Under 50 | 76 | 78.1 |

———◆———

3. In No. 11,952, by stipulation of counsel, Waugaman submitted to trial prior to a hearing on his motion to dismiss. The parties agreed, however, that the motion could be pressed if, as in fact transpired, Waugaman was found guilty.

\* Expressed as % of total population in the District of Maryland.

\*\* Expressed as % of eligible labor force.

\*\*\* Expressed as % of eligible population.

Before proceeding to a consideration of the constitutional and statutory requirements for the selection of grand and petit juries and whether they are satisfied, we call attention to a possible deficiency in defendants' proof. The statistics offered and which we have summarized were all based upon returns to questionnaires. There was no showing, however, how many questionnaires were sent to prospective jurors that were not returned, and what steps, if any, were taken to induce return; [4] thus, the accuracy of the data proved may or may not be substantially adversely affected depending upon whether all or substantially all of the questionnaires sent to prospective jurors were returned or whether a substantial factor of non-returns should be given weight. The Court takes judicial knowledge of the fact that there is a likelihood that young adults, having greater mobility than the average of the population, persons in military service, and young women having small children and the responsibility of caring for them, would be more likely than older adults having a relatively fixed abode, not in military service and having grown families, *not* to return a questionnaire because they considered themselves ineligible for jury duty, because the questionnaire did not reach them, or because they considered prospective jury duty onerous by reason of their special circumstances. By the same token, there was no evidence that the clerk failed, within the scope of his authority, to take action to induce the return of questionnaires. On this subject, the record is silent. Thus, we have no occasion to consider what, if any, positive duty rested on the Clerk and whether that duty was fulfilled.

■■■ Assuming, however, reasonable accuracy in the statistical data concerning jury composition, we turn to the legal considerations which the appeals present. The constitutional principle that juries must be selected from a fair cross-section of the community is now well-established. See, e. g., Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Mobley v. United States, 379 F.2d 768 (5 Cir. 1967); Rabinowitz v. United States, 366 F.2d 34 (5 Cir. 1966); United States v. Dennis, 183 F.2d 201 (2 Cir. 1950), aff'd on other grounds, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).[5] While the cross-sectional concept is firmly imbedded in the law, the constitution does not require that the jury or jury venire be a statistical mirror of the community. Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961); Swain v. Alabama, supra; Mobley v. United States, supra; Rabinowitz v. United States, supra; Dow v. Carnegie-Illinois Steel Corporation, 224 F.2d 414 (3 Cir. 1955), cert. den., 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956).

It may be fairly said that the 1948 jury selection act, 62 Stat. 951, and its predecessors, were statutory buttresses to the cross-sectional principle. Ballard v. United States, 329 U.S. 187, 190–191, 67 S.Ct. 261, 91 L.Ed. 181 (1946). Until 1957, however, Congress was content to retain as a part of federal law varying

---

4. The Watkins report on The Jury System in Federal Courts, approved by The Judicial Conference of the United States, September, 1960, 26 F.R.D. 409, recommended legislation permitting prospective jurors who wilfully failed to respond or falsely answering to be punished for contempt. 26 F.R.D., at 422. Such legislation was not, however, enacted.

5. While some of these cases were purportedly decided on the basis of the supervisory function of the Supreme Court over lower federal courts, they are considered to be decisions pertinent to constitutional questions. See, e.g., Brooks v. Beto, 366 F.2d 1, 11–12 (5 Cir. 1966). Cf. Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed. 118 (1961).

state disqualifications and discriminations. But, in 1957, with the enactment of the Civil Rights Act of 1957, 71 Stat. 638; 28 U.S.C.A. § 1861 (1964), varying state disqualifications and discriminations were eliminated so that it can be said that thereafter the cross-sectional concept was the statutory test, as well as the constitutional test, of jury validity. The precise correlation between constitutional and statutory requirements and whether they are congruent or whether stricter rules apply to federal courts, both under the statutes and the supervisory power of the Supreme Court over lower federal courts, than to state courts under the equal protection clause in regard to jury selection is a matter we need not explore. Certainly, since the 1957 amendment to 28 U.S.C.A. § 1861, the statutes are at least as demanding as the constitution in regard to the factors of which defendants complain and we predicate our decision on the statutory test as developed in such cases as *Glasser, Thiel, Ballard*, and *Rabinowitz*.

Defendants place heavy emphasis on Rabinowitz v. United States, supra, in several regards. They stop short, however, from urging that *Rabinowitz* holds that the "key man" method of jury selection is unconstitutional *per se*. In this they are well advised, because that case has not received that interpretation by the court which decided it. Mobley v. United States, supra.[6] Rabinowitz was concerned primarily with the question of whether the qualifications specified in 28 U.S.C.A. § 1861 et seq., were to be considered the *sole* or minimum qualifications for jury service. *Rabinowitz* held that they were the sole qualifications. In *Rabinowitz* the sole method of jury selection was the "key man" system, with no or very few Negroes employed as "key men" and with the jury commissioners acquainted with few Negroes, all with the result than an analysis of jurors chosen showed systematic although unin-

tentional exclusion along racial lines. The *Rabinowitz* case held that the use of this "key man" system combined with imposition of standards for jury selection in addition to those prescribed by 28 U.S.C. A. § 1861 et seq., resulted in an illegally constituted jury. By contrast, the instant cases show almost perfect balance along racial lines and the use of Negro "key men" to recruit Negro jurors.

 It is true that *Rabinowitz* stated that "if a fair cross-section is consistently lacking, then, without more, it is established that the commissioners have failed in their duty." 366 F.2d, at 58. But the issue which then emerges is what constitutes a "fair cross-section." The district court in the instant case took the position that, absent intentional exclusion, *substantial* representation of the various relevant elements in the community was enough. We agree. Under the authorities we have cited, we reject defendants' apparent argument that approximately proportional representation of the various identifiable groups in the community is required. If it can be obtained by random selection, proportional representation may be the ideal—because it is the ultimate opposite to intentional exclusion—but it can be achieved only rarely, and then only in regard to some but not all, of relevant criteria. Substantial representation is all that is required.

In the light of the *concessum*, we put aside any consideration of intentional systematic exclusion. We note also that the statistical data will not support even an inference of "tokenism." We turn, therefore, to a consideration of whether the degree of representation by category deviated so substantially from that present in the population in the District of Maryland eligible for jury service that the constitutional and statutory tests were violated.

At the outset, it stands to reason that in a body limited in number, such as a

---

6. The "key man" system has frequently survived challenge. See, e. g., Scales v. United States, 260 F.2d 21, 44–46 (4 Cir. 1958), aff'd., 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); United States v. Hoffa, 349 F.2d 20, 29–30 (6 Cir. 1965), and cases cited therein.

jury panel or a grand or petit jury, accurate and complete representation of all of the groups and categories that comprise a modern heterogeneous community is an absolute impossibility, even when measured over a substantial period of time. Moreover, to afford substantial representation of some categories such as sex, race, religion, political persuasion and economic grouping (occupation), to name a few, it may be necessary to sacrifice ideal representation measured by geography and age, to name others. Where population is distributed, in an industrialized district along economic lines and where age distribution follows economic distribution in part, ideal representation by geographical tests must be sacrificed to more basic criteria. Similarly, to achieve proper racial balance, present day facts of life may require that ideal representation by geography and economic class be departed from.

 Specifically, in the cases at bar, we find substantial representation in each of the categories about which complaint is made and this, coupled with the absence of intentional exclusion and evidence of mere tokenism, satisfies the constitution and the statute. We do not know why there was not a greater representation of women unless it be that the key men were reluctant to suggest women who were fully engaged in rais-ing their children or managing their households or that women were not as fully represented in telephone directories or lists of club membership from which names were selected. But Ballard v. United States, supra, and Glasser v. United States, supra, which held juries fatally defective because of total exclusion and extreme underrepresentation of women, respectively, were cases of systematic and intentional exclusion of women—factors not present here. We cannot say that an average representation of 29%, and an actual representation of 27.5% of women on the grand

jury which indicted defendants, transgress the law.

 As to age as a measure of representation, we do not believe that members of arbitrarily drawn age brackets necessarily constitute valid categories for measuring the legality of jury selection. See, King v. United States, 346 F.2d 123 (1 Cir. 1965). A community cross-section, however, will invariably contain a broad representation of individuals of various ages. In the instant cases, again the record does not disclose the reasons for apparent underrepresentation in the younger age brackets, although we can suppose that key men would fail to suggest younger persons who have military service obligations, or first employment, or young families, or who are pursuing higher education, and that this segment of the population, having greater mobility, is underrepresented on club membership lists or city directories, or telephone directories. But again, especially in groupings over age 30, the representation was substantial,[7] although less than statistically perfect. King v. United States, supra, which considered jury representation by the category of age, sustained unintentional exclusion of those 25 and under and those over 70. We conclude that the constitution and the statute were not violated in regard to age categories of jurors.

In selecting jurors from throughout a district, a district court is enjoined to make its selection from the parts of the district "so as to be most favorable to an impartial trial, and *not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service.*" 28 U.S.C.A. § 1865 (emphasis added). It is a matter of common knowledge that Montgomery and Prince George's Counties, Maryland, are the "bed-room" counties of the City of Washington. Thus, many of the residents of those counties are employed in the District of Columbia. Admittedly, the dis-

---

7. As the opinion of the district court demonstrates (United States v. Cohen, 275 F. Supp. 740) if the ages on jurors are bro-ken down on the basis of 21 to 44 and 45 and over, no substantial imbalance is shown.

trict court entered no order excluding any portion of the District of Maryland from the area in which jurors were to be selected, but there was persuasive evidence of the difficulties experienced by the Clerk in getting the names of residents of the two counties in question. Although the representation was low, there was no effort to exclude residents of these counties. By contrast, Katz v. United States, 321 F.2d 7 (1 Cir. 1963), cert. den., 375 U.S. 903, 84 S.Ct. 193, 11 L.Ed.2d 144 (1963), refused to invalidate a jury selection system which systematically excluded jurors who lived more than 60 miles from the court house. Additionally, large parts of these counties are urban centers. Geography, as a proper criterion for measuring jury selection, has more significance when it reflects urban versus rural representation. Defendants offered no statistics to disclose this division. Nor did they offer any basis for supposing that the urban residents of Montgomery and Prince George's Counties would think or react differently from residents of Baltimore City on matters which would likely be submitted to them as jurors.

■ We find no merit either in the geographical argument based on representation by postal zones in the Metropolitan Baltimore Area. Disproportionate representation by postal zone may well be an inescapable corollary of achieving substantially proportionate representation by more basic criteria, having due. regard to population density and population composition. We do not think that representation by postal zones is a criterion worthy of consideration.

■ Measured by occupation, blue collar workers constituted 29.3% of the eligible population, but only 18.6% of the jurors drawn. We conclude that the constitution and the statute have been satisfied in this regard. The representation of blue collar workers was substantial. The same is true when the composition of the jury is considered by the degree of education. Neither the constitution nor the statute requires more.

## II

In addition to his claims of jury illegality, Waugaman claims error in his trial (a) in the district court's refusal to replace his court-appointed counsel two days before hearing on a motion to suppress evidence and twelve days before trial, (b) in the district court's denial of a motion for change of venue because of alleged prejudicial newspaper publicity, (c) in the district court's denial of a mistrial because the jury allegedly saw him in handcuffs and because a deputy United States Marshal followed him in the courtroom, and (d) because evidence used to convict him was illegally obtained and all of the evidence was legally insufficient to prove his guilt. In none of these contentions do we find merit.

Waugaman was taken into custody December 3, 1966. After he was indicted and it was determined that his privately-retained counsel, who had represented him at the preliminary hearing prior to indictment, would not represent him at trial, the district court appointed an attorney to represent him. Subsequently, an associate of the attorney so appointed also entered an appearance in the case. The initial appointment was made on or about January 6, 1967, and the attorney appointed was, in the view of the district judge making the appointment, "an exceedingly capable lawyer," one felt to be "completely competent and capable of handling the matter," and one, moreover, who was part of a large, leading law firm which had the resources to provide adequate and full representation. Between the date of appointment and March 16, 1967, counsel conferred with Waugaman fifteen times and had six conferences with the prosecutor. A substantial quantity of time was expended by counsel on legal research, preparation of motions, consideration of motions which were concluded not to be filed, preparation of memoranda, and general preparation for trial.

Waugaman's request, on the eve of hearing of the motion to suppress evidence and on the eve of trial, was ground-

ed exclusively on the admission of counsel that neither had theretofore handled a criminal case, although it was Waugaman's impression that both were good attorneys. Waugaman knew of his attorneys' lack of prior experience shortly after the appointment but did not communicate his objections to the court for over two months.

Replacement of counsel was a matter addressed to the discretion of the district court. Ungar v. Surafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); United States v. Cozzi, 354 F.2d 637 (7 Cir. 1965); Smith v. United States, 122 U.S.App.D.C. 300, 353 F.2d 838 (1965); Juelich v. United States, 342 F.2d 29 (5 Cir. 1965). We find no abuse of discretion in the circumstances of this case. Although after the fact, our examination of the transcripts of the motion to suppress and of the trial satisfies us that Waugaman enjoyed highly competent representation. His claim that counsel should have pressed the absence of an attorney at a lineup in which he appeared does not show lack of diligence or competence on the part of his attorneys. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), which established the necessity for counsel at lineup, were not decided until after Waugaman's trial and the holding in each is not retroactive. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The competency of counsel is not to be measured by their ability as seers.

Waugaman's venue contention is little more than a bald assertion. There was publicity about the robbery of the building and loan association, the crime which Waugaman was accused of committing on December 2, 1966. But the venire from which Waugaman's jury was chosen was questioned as to whether any of its forty-six members had read the article. The only venireman who replied affirmatively was stricken for cause. The venire was also asked if they had read about or knew of a certain Nick Trotta, who would be a witness in the case. The four veniremen who responded affirmatively were also stricken for cause. Manifestly, there was no showing that, even if prejudicial, there was sufficient publicity to infect the jury and indicate the need for a change of venue.

Waugaman's contention that jurors saw him in handcuffs comes before us under an insurmountable burden of proof. In an evidentiary hearing on this issue, three deputy United States Marshals denied that such was the fact and convincingly explained why no member of the jury could have made such an observation. The district court credited them and not Waugaman, who testified to the contrary. We cannot say that the district court was clearly erroneous, and we accept the conclusion that the event did not transpire.

The district court, prior to trial, issued instructions that only one deputy marshal should arise when Waugaman rose and that Waugaman might remain seated when questioning witnesses. These instructions were carried out. These instructions were issued in the light of the fact that Waugaman had been previously convicted of conspiracy to escape from federal custody. With due regard to the rights of the defendant, the rights of the United States to avoid flight required no less in the security of the person of the defendant. We find no prejudice of the defendant's rights.

Waugaman's contention that illegally seized evidence was used to convict him is largely factual. It depends upon whether there was probable cause to arrest him without a warrant, because evidence of a sum of money found in his wallet, two safe deposit box keys, five United States government bonds, and some stubs from United States government bonds, taken from the person of the defendant at the time of his arrest, were admitted in evidence against him.

The facts are that at about 1:00 A.M., December 3, 1966, Sergeant Joseph Tomshack, of the Baltimore City police department, received a telephone call from Nick Trotta, the proprietor of the Club Troc, a night club on East Baltimore Street, in Baltimore, Maryland, requesting him to come to the bar. When he arrived, Trotta led Tomshack to his office in the basement of the bar and showed him an open leather-type brief case containing a large quantity of cash. Trotta advised Tomshack that a man, who was white, about thirty to forty years old, medium height and medium build, dressed neatly but with a dirty shirt and face, left the brief case at about midnight and said he would be back for it at 2:00 A.M. Trotta said that he had placed the brief case initially on a beer cooler behind the bar, but, about twenty minutes later when it was necessary for him to move the brief case it came open, exposing the money, and then Trotta took the brief case to his office.

Tomshack reported to Lieutenant McKew, who arrived at the Club Troc at about 1:10 or 1:15 A.M. McKew told Tomshack that he had heard two radio news bulletins to the effect that three men had held up the Rosedale Federal Savings and Loan Association, on Belair Road, in Baltimore City, at 8:00 P.M., and escaped with a large amount of cash. One radio station described one of the perpetrators of the crime as white with a blackened face.

This interview, at which Trotta was also present, took place on the sidewalk outside of the bar. Because it was cold, Trotta went indoors to get a coat, but returned momentarily and told McKew and Tomshack that the man who left the brief case was now inside. Trotta was instructed to go back inside the bar where, in the presence of a plainclothesman who had been summoned, Trotta gave the brief case to Waugaman.

In the meantime, Tomshack communicated with police headquarters and obtained a more detailed description of the robbers. He learned that one was thirty to thirty-five years old, five feet eleven inches tall, and had a black substance, possibly shoe polish or burnt cork, on his face. As Tomshack was returning to the Club Troc, he saw Waugaman with the brief case come out of the front door of the bar and walk down Baltimore Street. Tomshack told McKew "there he goes" and, further, that Waugaman fitted the description. McKew and Tomshack then walked rapidly behind the defendant and, before they arrested him, they both noticed "black stuff" on Waugaman's shirt collar protruding above his jacket, and on the back of his neck and ears. Waugaman was arrested and his brief case full of money seized. The other articles were taken from Waugaman's person in a more intensive search conducted at the Central police station.

■ Admittedly, each of the items of information, and each of the observations of Tomshack and McKew, did not in themselves establish probable cause, but, on logic and authority, they should not be so isolated. Rather, they should be considered together. The combination of the sight of money in the brief case, with the knowledge that a robbery had occurred five hours earlier, plus the fact that Waugaman matched the general age and height description of one of the robbers, that one of the robbers was described as having a black substance on his face, that Trotta told Tomshack that Waugaman had some "dirt" on his face, that Waugaman had returned to the bar and claimed the brief case, and that before Waugaman was arrested Tomshack and McKew observed a black substance on the back of Waugaman's neck and ears and on the back of his shirt collar, manifestly established probable cause. Suspicion blossomed into facts which, interpreted sensibly, compelled the arrest. Brinegar v. United States, 338 U.S. 160, 177, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

■ At trial, in addition to the facts already recited, two employees of the savings and loan association positively identified Waugaman as one of the three

robbers, and some of the money and some of the government bonds he was carrying as having been taken from the association. The sufficiency of the evidence to support a conclusion of guilt, beyond a reasonable doubt, was ample.

Affirmed.