**UNITED STATES of America,**
**Plaintiff,**

v.

**J. Howard DEARDORFF et al.,**
**Defendants.**

**No. 71 Cr. 111.**

United States District Court,
S. D. New York.

Oct. 5, 1971.

See also D.C., 343 F.Supp. 1047.

Whitney North Seymour, Jr., U. S. Atty., by Robert G. Morvillo and D. Gordon III, New York City, for plaintiff.

Davis, Polk & Wardwell by Robt. Fiske, Jr., Curtis, Mallet-Prevost, Colt & Mosle, by Peter Fleming, Jr., Shea, Gallop, Climenko & Gould, New York City, Alan M. Dershowitz, Cambridge, Mass., for defendants Kahn and Teleprompter.

MOTLEY, District Judge.

## I. STATEMENT OF FACTS

A two count indictment was filed against defendants on January 28, 1971. The first count charges defendants with conspiring to violate 18 U.S.C. § 1952 (the Travel Act) by agreeing to use an interstate facility to intentionally promote, manage, establish or carry on or facilitate the promotion, management, establishment or carrying on of the unlawful activity of bribery. The second count alleges, as a substantive violation of 18 U.S.C. § 1952, that the defendants used interstate facilities to intentionally promote, manage, establish or carry on, the unlawful activity of bribery in violation of the Penal Code of the State of Pennsylvania, or facilitate the promotion, management, establishment or carrying on of such activities.

The Government alleges the following account. On January 18, 1966 defendant Kenneth O. Tompkins, then the mayor of Johnstown, Pennsylvania, and defendants Robert McKee and J. Howard

Deardorff, then city councilmen of Johnstown, caused the approval of an ordinance to permit sealed competitive bidding for a cable television franchise in Johnstown. Six days later, on January 24, Irving Kahn, president of Teleprompter, travelled from New York to Johnstown to meet with those three city officials. At the meeting Kahn, Tompkins, McKee and Deardorff agreed that Teleprompter would pay the three Johnstown officials a $15,000 bribe if they would vote in favor of awarding the cable television franchise to Johnstown Cable TV, a subsidiary of Teleprompter.

At the February 1, 1966 meeting of the committee of the whole of the Johnstown City Council, Tompkins, McKee and Deardorff voted to reject all bids on cable television submitted by Teleprompter's competitors.

At a general session of the City Council on February 8, Tompkins made a motion to arrange a meeting with officers of Teleprompter to discuss terms for a cable television franchise. Deardorff seconded the motion, and all three defendant officials voted for it.

Finally, at the March 2 general session of the Johnstown City Council, these three defendants voted for Ordinance No. 3678, which granted Johnstown Cable TV a ten-year exclusive cable television franchise with an option to renew for ten years.

Meanwhile, on February 25, 1966 Kahn and Teleprompter transmitted $7,-000 to defendant Tompkins in Johnstown. Tompkins, in turn, gave McKee and Deardorff each $2,000 sometime in March. On August 26, 1966 Kahn and Teleprompter sent Tompkins another payment, this time of $6,035.61. A third payment of $1,464.39 was made to Tompkins by Kahn and Teleprompter on October 20. Tompkins again gave McKee and Deardorff $2,000 each soon after receiving the last installment from Kahn and Teleprompter.

The Government alleges, in sum, that Kahn sent Tompkins a total of $14,500.-00, of which Tompkins gave McKee and Deardorff $4,000 apiece. In return, it is charged, the three defendants used their official positions to provide Teleprompter's subsidiary with the exclusive Johnstown cable television franchise.

Defendants have made a variety of pre-trial motions. They move to dismiss the indictment on the ground that their alleged conduct does not violate federal law, and on the ground that the grand jury was improperly selected. They also move to dismiss the conspiracy count. They further move for a bill of particulars and for discovery and inspection. There is also a motion for an order directing the government to ascertain and disclose the fruit of any monitoring it has conducted.

II. MOTION TO DISMISS THE INDICTMENT BECAUSE THE ALLEGED CONDUCT DOES NOT VIOLATE FEDERAL LAW

There can be no doubt that the alleged activities of defendants fall within the literal terms of the statute. The relevant part of 18 U.S.C. § 1952, including its title, reads as follows:

"Interstate and foreign travel or transportation in aid of racketeering enterprises.

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000

or imprisoned for not more than five years, or both.

(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States."

■ Defendants are charged with carrying on unlawful activity in violation of Section 1952(a) (3). The unlawful activity with which they are charged is defined in subsection (b) (2) as ". . . bribery . . . in violation of the laws of the State in which committed or of the United States." The phrase "business enterprise" used in defining unlawful activity in subsection (1) of § 1952(b) is not used in subsection (2) delineating bribery as an unlawful activity. Read literally, therefore, the statute does not require that bribery in violation of § 1952 be connected with a criminal business enterprise. The indictment thus clearly alleges facts bringing defendants within the terms of the statute.

Defendants contend, however, that bribery must be connected with, or in aid of, a racketeering enterprise to violate § 1952. In support of this interpretation they point to the language of the title of § 1952, the section's legislative history, and its recent interpretation in Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). For the reasons which follow, the court rejects defendants' interpretation of § 1952 and finds their alleged conduct within its terms.

■ The title of § 1952, as reproduced above, refers to "interstate or foreign travel or transportation in aid of racketeering enterprises." Defendants feel that this title, in conjunction with legislative history, requires that

connection with racketeering enterprises be considered an element of the offense. However, the title of a statute cannot limit the plain meaning of the text, and is resorted to only where ambiguity already exists. Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1946); United States v. Minker, 350 U.S. 179, 76 S.Ct. 281, 100 L.Ed. 185 (1956); Tibke v. Immigration and Naturalization Service, 335 F.2d 42 (2 Cir., 1964). See also Sutherland, Statutory Construction § 4802 (3d ed. Horack 1943). As we have seen above, the body of Section 1952 is clear. There is thus no need to look to the title, an endeavor that in this case would produce, rather than ameliorate, ambiguity.

Were we to seek guidance from the title, however, we would find that it adds nothing to the meaning of the text. The term "racketeering enterprise" is not specifically defined in Title 18, but the terms "racketeering activity" and "enterprise" are defined in 18 U.S.C. § 1961. "Racketeering activity" is defined as "any act which is indictable under any of the following sections of Title 18, United States Code:  . . . Section 1952.  . . ." Section 1961 (1) (B). "Enterprise" is defined as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Section 1961(4). Combining the two definitions a "racketeering enterprise" becomes an individual or group of individuals engaging in acts indictable under § 1952. This definition certainly does not elucidate the elements of a violation of § 1952 itself.

■ Defendants stress that the legislative history of § 1952 demonstrates that the section can be applied only where organized crime and racketeering are involved. It is a common rule of statutory interpretation that legislative history not be used to interpret a statute that is clear and unambiguous on its face. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed.

442 (1916); Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944, 93 L.Ed. 1207 (1949). See also Sutherland, *supra*, § 4502; United States v. Great Northern Ry. Co., 343 U.S. 562, 72 S.Ct. 985, 96 L.Ed. 1142 (1952).

■ This canon of interpretation is particularly apposite where the legislative history is itself somewhat ambiguous. For example, defendants cite passages in the hearings that indicate that § 1952 was aimed at organized crime.[1] On the other hand, the Ninth Circuit Court of Appeals has found that subsection (b) (2) sought to prevent and punish single criminal acts, not necessarily a continued course of conduct. Marshall v. United States, 355 F.2d 999, 1003 (9th Cir., 1966). Reconciliation of conflicting legislative history, however, is a latter stage of statutory interpretation, not the first step.

Defendants place great reliance on the Supreme Court's decision in Rewis v. United States, *supra*. The convictions in that case centered around an illegal lottery, or numbers operation, in northern Florida. There were essentially two groups of defendants: 1) a group of customers of the lottery who resided in Georgia and crossed into Florida to place bets, and 2) a group which conducted the gambling operation but never crossed state lines as part of their gambling activities.

As to the first group, the customers, the Court of Appeals held that "the patronizing by interstate gamblers of a gambling establishment" does not fit within the statutory terminology of "promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of any unlawful activity." Rewis v. United States, 418 F.2d 1218, 1221 (5th Cir. 1969).

The Supreme Court affirmed. 401 U.S. at 810, 91 S.Ct. at 1058.

The second group of defendants, those who operated the numbers operation, were found by the Supreme Court to have been insufficiently related to interstate travel to fall within the Travel Act. That Act, it was held, does not apply to criminal activity "solely because that activity is at times patronized by persons from another State." Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971).

Measured by the facts alleged in the indictment, defendants' actions differ from those of both groups of defendants in *Rewis*. Defendants Kahn and Teleprompter are charged with being the perpetrators of the bribery scheme. Unlike the customers of the numbers operation, their acts, if proved, amount to the promotion, management, establishment or carrying on, or the facilitation thereof, of the unlawful activity of bribery.

■ Defendant Kahn allegedly travelled in interstate commerce to Johnstown to offer the bribe. He also allegedly sent a number of the payments interstate from defendant Teleprompter to other defendants. The intimate connection between the use of interstate facilities and the crimes charged differentiates these defendants from the second group of defendants involved in *Rewis*. Here, there is no question that the alleged crime of Kahn and Teleprompter is substantially interstate in nature.

Finally, in sustaining the indictment against defendants, the court notes that all other courts that have ruled on this question have upheld the application of § 1952 to isolated instances of extortion and bribery. See Marshall v. United States, 355 F.2d 999 (9th Cir. 1966),

---

1. For example, the following testimony of Attorney General Robert F. Kennedy appears in the Senate Report (Report No. 644, 87th Cong., 1st Sess., pp. 15–16) :
"The target clearly is organized crime. The travel that would be banned is travel 'in furtherance of a business enterprise' which involves gambling, liquor, narcotics and prostitution offenses or extortion or bribery. Obviously, we are not trying to curtail the sporadic, casual involvement in these offenses, but rather a continuous course of conduct sufficient for it to be termed a business enterprise."

cert. denied, 385 U.S. 815, 87 S.Ct. 34, 17 L.Ed.2d 54 (1966); McIntosh v. United States, 385 F.2d 274 (8th Cir. 1967); United States v. Zirpolo, 288 F.Supp. 993 (D.N.J.1968); rev'd on other grounds, 450 F.2d 424 (3rd Cir. 1971); United States v. Feudale, 271 F.Supp. 115 (D.Conn.1967).

### III. MOTION TO DISMISS CONSPIRACY COUNT

Defendants Kahn and Teleprompter move to dismiss count one of the indictment on the ground that there can be no conspiracy to commit a crime which can only be committed by the concerted action of the parties to the agreement.

■ Defendants' discussion of the law in this area mistakenly relies on cases concerning conspiracy to commit the substantive crime of bribery. The substantive crime charged in this indictment is not bribery but use of interstate facilities to commit an unlawful act. No concerted action is required to violate § 1952, regardless of whether the underlying unlawful act usually requires joint action, like bribery, or does not, as with arson. United States v. Parzow, 391 F.2d 240 (4th Cir. 1968); United States v. Zirpolo, *supra.*

### IV. CHALLENGE TO GRAND JURY

Defendants Irving Kahn and Teleprompter Corporation have moved to dismiss the indictment in this case on the grounds that: 1) the grand jury which indicted defendants was constituted in contravention of the standards set forth in the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq.; and 2) the master jury wheel and the jury venire from which defendants'

grand jury was chosen did not include, or had an underrepresentation of, the young, the poor, blacks, the poorly educated, and the unskilled, with the result that defendants were denied their constitutional rights under the Fifth and Sixth Amendments.

In conjunction with this motion, defendants Kahn and Teleprompter Corporation have moved on the authority of 28 U.S.C. § 1867(f) to discover a random sampling of the questionnaires completed by prospective jurors in the Southern District of New York; specifically, one-quarter of the questionnaires mailed by the Clerk in November, 1969, and returned prior to May 10, 1970, as well as all of the questionnaires completed by members of the grand jury panel from which the grand jury which indicted defendants was selected.[2] Defendants have also moved, pursuant to 28 U.S.C. § 1867(d), for a hearing on their statutory and constitutional challenges to the grand jury in order to present to the court the questionnaire data sought to be discovered here.

### A.

The grand jury in question was selected in accordance with procedures set forth in the "Plan for Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York."[3] This plan was formulated under the authority of 28 U.S.C. § 1863(a) which provides, in part:

Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title,

2. According to the affidavit of Michael D. Schmitz, one of the attorneys for defendants Kahn and Teleprompter Corporation, Mr. Schmitz asked former Chief Judge Sugarman of this Court to supply him with the names and juror questionnaires of the jury venire from which defendants' grand jury was selected. The affidavit states that the desired names were giv-

en, but that the questionnaires were withheld. The affidavit does not indicate whether a demand was made for every fourth questionnaire mailed in November, 1969, and returned prior to May 10, 1971.

3. As amended March 6, 1969, approved by the Reviewing Panel of the Second Circuit, March 6, 1969. The Plan first went into effect on December 22, 1968.

and that shall otherwise comply with the provisions of this title . . .

As the first branch of their argument defendants contend that the Southern District Plan substantially fails to comply with the statutory mandate for the jury selection procedure set forth in § 1863(a) and related sections.

The Southern District procedure for selecting jurors, which first went into effect on December 22, 1968, is basically as follows. The source of names for the master jury wheel is the voter registration lists of the various counties comprising the Southern District of New York, the age of twenty-one being fixed as the minimum age for jury service. Plan, Art. III (A); Art. VI. (1). Names are selected for the master jury wheel at random from each county's registration lists in a proportion equal to the ratio that the number of names on the particular county's lists bears to the total number of names on all of the counties' lists. Questionnaires are then mailed to a certain number of persons randomly chosen from the master jury wheel. Those jurors who qualify on the basis of their completed questionnaires, and are not otherwise excused, are placed on the qualified jury wheel—the source of the grand jury venires and the individual grand juries. The Plan provides that the master wheel be completely emptied and refilled every four years. Art. III. (B).

Defendants challenge several aspects of the Plan as not complying with the Jury Selection and Service Act of 1968. First, they point to the objective of 28 U.S.C. § 1861:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a *fair cross section* of the community in the district or division wherein the court convenes . . . (Emphasis added)

While the statute provides for the use of voter registration lists, or lists of actual voters, as the main source for juror lists, it states that: "The [district court] plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. § 1863 (b) (2). Defendants contend that the Southern District procedure of relying on voter registration lists exclusively, leads to the selection of grand juries that do not represent a fair cross section of the community, because certain groups such as the young, the poor, blacks, the poorly educated, and the unskilled do not register to vote in such great numbers as other groups. Thus, defendants maintain that the voter registration lists of the various counties must be supplemented by other lists, such as unemployment rosters or welfare roles.

Another way in which defendants claim the Southern District Plan fails to produce a cross section is by its provision that the master jury wheel be completely emptied and refilled only once every four years. Defendants point out that if the youngest persons on the grand jury wheel are twenty-one when the wheel is first made up from the voter registration lists (these persons having just become eligible to register to vote), these same youngest persons will have almost reached the age of twenty-four before the grand jury wheel is refilled again. Thus, juries constituted towards the end of the four-year period will have no persons of the ages of twenty-one to almost twenty-four on them.

Defendants' third contention relating to the policy of 28 U.S.C. § 1861 is that the requirement that jurors be twenty-one years of age excludes eighteen to twenty year olds in contravention of the cross section requirement. The identical minimum age requirement found in 28 U.S.C. § 1865(b) (1) is interpreted by defendants not to be an absolute requirement, but to indicate merely that the minimum age for jury service is tied to the minimum age for voting.

Since the minimum voting age is now eighteen, the minimum age for jury duty must also be set at eighteen.

■ Before addressing each of the specific claims of defendants it must be made clear that, "While the cross-sectional concept is firmly imbedded in the law, the constitution does not require that the jury or jury venire be a statistical mirror of the community [citations omitted]." United States v. Di Tommaso, 405 F.2d 385, 389 (4th Cir. 1968). See also H.R. #1076, 1968 U.S.Code Cong. & Adm.News, Vol. 2, pp. 1792, 1794. Not all groups need be represented on the grand jury wheel, nor must the cognizable groups be represented in the same proportions as their proportions in the community.

■ To prevail on their contentions, defendants must show: first, that the groups in question were cognizable for purposes of defining a fair cross section of the community; and, second, assuming without deciding that it is enough to show that a cognizable group was severely underrepresented, as opposed to systematically excluded, that the groups in issue here were, in fact, underrepresented on the grand jury wheel and in the jury venire.[4]

■ Turning now to defendants' first claim, defendants have made no showing that indicates that unsupplemented voter registration lists cannot yield a cross section of the community in the Southern District of New York. The Southern District Plan contains an explicit finding by the judges of this Court that,

"The persons whose names appear on the voter registration lists of the aforesaid eleven counties [comprising the Southern District] used for the last Federal or State general election represent a fair cross section of the community in the District." Art. III. (A).

Mere conclusory allegations and nationwide statistics regarding the propensity of the young, the poor, blacks, the poorly educated, and the unskilled to register to vote have limited relevance for a challenge to a plan in a particular geographic district. Lower registration of such groups in the South or West may skew nationwide figures so as to make them inapplicable to this District. If defendants' statistics are given weight here, then these very same figures might be used to overthrow juror selection plans relying on voter registration lists, or actual voter lists, anywhere in the country. Had Congress felt that voter lists were inadequate to produce a cross section anywhere in the United States, it would not have selected them as the primary source for jury lists. See 28 U.S.C. § 1863(b) (2), infra.[5] Moreover, the case law has consistently held that the exclusion of nonvoters from juries does not impair the cross sectional aspect of such juries. Camp v. United States, 413 F.2d 419, 421 (5th Cir. 1969) and cases cited therein; United States v. Butera, 420 F.2d 564, 573 (1st Cir. 1970) and cases cited therein at n. 21.

Defendants' second contention relates to the provision in the Southern District Plan for completely emptying and refilling the master jury wheel every four years. Defendants maintain that this is in contravention of the definitional section of the Jury Selection and Service Act which provides, in § 1869 (c), that: " 'voter registration lists' shall mean the official records maintained by State or local officials on persons

---

4. Defendants Irving Kahn and Teleprompter Corporation are not members of any of the groups claimed to be excluded or underrepresented here. However, we agree with defendants' contention that one need not be a member of the underrepresented group to challenge a grand jury on cross sectional grounds. Thiel v. Southern Pacific Co., 328 U.S. 217, 223, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

5. See H.R. #1076, supra, at p. 1794:
"The bill [the Jury Selection and Service Act of 1968], as amended, provides that sources of names other than voter lists may be used to supplement, but not to supplant, voter lists."

registered to vote in either the *most recent* State or the *most recent* Federal general election. . . ." (Emphasis added).[6] Defendants read this provision to mean that the master jury wheel must be refilled at least every two years. They rely for this interpretation on a statement in the House Report on the Jury Selection and Service Act which reads: ". . . while the two subsections permit the plan to choose between State and Federal lists, they also insure that the list used will in any event not be more than 2 years old." H.R. #1076, *supra*, at pp. 1806–07. However, § 1869(c), as well as the above commentary, can be read to mean that at any time the master jury wheel is to be completely refilled, the most recent voter registration, or actual voter lists must be used. Such an interpretation is supported by 28 U.S.C. § 1863 (b) (4) which states that, "The plan shall provide for periodic emptying and refilling of the master jury wheel at specified times." See also H.R. #1076, *supra*, at p. 1800. Surely if Congress had meant to require refilling every two years it would have explicitly so stated.

▃▃▃ A four-year period was selected by the Judicial Conference of the United States, by a Special Resolution, and subsequently adopted by the Southern District, because it was thought that there would be a significant change in the registration rolls only at the time of presidential elections. Such a determination carries presumptive validity.[7] See Thiel v. Southern Pacific Co., 328 U.S. at 220, 66 S.Ct. 984.

▃▃▃ The simple answer to defendants' third contention is that if Congress wishes to set the minimum age for jury service at eighteen, rather than at twenty-one, to make the minimum age for jury service and for voting identical, it may do so. In the meanwhile, the Jury Selection and Service Act of 1968 is clear on its face as setting the minimum age at twenty-one.

Defendants cannot have it both ways. They cannot argue here that Congress believed the requirements for voting to be so intimately connected with those for jury service that it set the same minimum age for both, and argue, in support of their first contention, that Congress thought so little of the similarity of qualifications for voting and for jury service that it provided, by 28 U.S.C. § 1863(b) (2), *supra*, for large numbers of nonvoters to serve on juries.

Moreover, it must be noted that the grand jury which indicted defendants was empaneled on July 28, 1970. The Voting Rights Act amendments of 1970 which enfranchised 18 year olds, had not withstood constitutional challenge until December 21, 1970. Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272. The Twenty-Sixth Amendment to the Constitution which likewise permitted 18 year olds to vote was not passed and submitted to the States for ratification until March 23, 1971.

Title 28 U.S.C. § 1867 provides the exclusive procedure for challenging a jury on the grounds that it was not chosen in compliance with the Jury Selection and Service Act of 1968. 28 U.S.C. § 1867(e). The section provides that:

> In criminal cases . . . the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury. 28 U.S.C. § 1867(a).

Subsection (d) provides that:

> Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute sub-

---

6. This definition is substantially the same as the definition of the term in the Southern District Plan. See Art. I.(4).

7. See letter of Judge Irving Kaufman of the U. S. Court of Appeals, Second Circuit, dated January 20, 1970.

stantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commission or clerk, or any other relevant evidence. . . .

Defendants here have not met the requirement of subsection (d) regarding a sworn statement of facts. They have proffered nothing but conclusory allegations and non-specific national statistics in support of their grand jury challenge. Nor would the discovery of the data defendants seek materially aid their case.

As to some groups, defendants have failed to show that they are cognizable groups for purposes of a cross sectionally valid jury. They have submitted affidavits that are intended to prove that the views of eighteen to twenty-one year olds are significantly different from those of other age groups in the population. Assuming the truth of this allegation for purposes of deciding this motion, defendants have nonetheless failed to show that the attitudes of this group are inadequately represented by those several years older than they, that is, that eighteen to twenty-one year olds are a distinct, cognizable group. See United States v. Di Tommaso, *supra*, 405 F.2d at 391, citing King v. United States, 346 F.2d 123 (1st Cir. 1965). As to the group of blacks, which is presumptively cognizable because it is a racial group, they have not indicated the actual proportion of this group in the population of the Southern District. Defendants have not defined a specific statistical community in terms of which the racial cross section can be measured.

Though the age group of twenty-one through twenty-five may be a cognizable group for purposes of a cross section, defendants have not shown that this group is statistically severely underrepresented on Southern District voter registration lists.

Defendants also maintain that the poor, the poorly educated, and the unskilled, either as a single group, or as three distinct groups, are underrepresented. They have made no showing statistically, merely asking the court to take judicial notice of the fact that such groups tend to register to vote less, and are thus underrepresented on voter registration lists.

**B.**

The second branch of defendants' motion is a constitutional challenge to the jury selection procedure employed here, grounded on the due process clause of the Fifth Amendment, as it makes applicable to the federal government the equal protection clause of the Fourteenth Amendment, and on the Sixth Amendment.

Defendants consistently confuse the issue of the personal right to serve on a grand jury with the issue of the right to have a particular group represented on one's grand jury. The first issue, which pertains to the right of equal protection, is not before the court in this case. Nor can defendants claim that they have been denied a jury of their peers, since defendants are not members of any of the allegedly underrepresented groups.

It is important to note that defendants seem to mistake the standard to be applied for determining whether there is a cross section.

"It is true that *Rabinowitz* [v. United States, 366 F.2d 34 (5th Cir. 1966)] stated that 'if a fair cross section is consistently lacking, then, without more, it is established that the commissioners have failed in their duty.' 366 F.2d, at 58. But the issue which then emerges is what constitutes a 'fair cross-section.' The district court in the instant case took the position that, absent intentional exclusion, representation of the various relevant elements in the community was enough. We agree. Under the authorities we have cited, we re-

ject defendants' apparent argument that approximately proportional representation of the various identifiable groups in the community is required. If it can be obtained by random selection, proportional representation may be the ideal—because it is the ultimate opposite to intentional exclusion—but it can be achieved only rarely, and then only in regard to some but not all, of relevant criteria. Substantial representation is all that is required." United States v. Di Tommaso, 405 F.2d 385, 390 (4th Cir. 1968). See also, United States v. Butera, 420 F.2d 564, 567 (1st Cir. 1970); United States v. McVean, 436 F.2d 1120, 1122 (5th Cir. 1971).

"It should be remembered at the outset that, while a true cross-section is the ultimate ideal, it is by no means the Constitutional mandate. What is required is a jury selection system free of discrimination against properly cognizable groups." United States v. Butera, *supra*, 420 F.2d at 572.

As illustrated in Section I above, defendants have made no showing that they have been denied a cross section of the community in their grand jury venire, in violation of their right to equal protection.

■■■ Defendants' request for discovery of every fourth questionnaire mailed by the Clerk in November, 1969, and returned prior to May 10, 1970, and for a hearing on the questionnaire data, is denied for the reasons stated in Section A above. Defendants' motion to dismiss the indictment on the grounds that the grand jury was improperly constituted is also denied.

## V. MOTION FOR DISCOVERY

Defendants Kahn and Teleprompter move for discovery and inspection pursuant to Rule 16, Fed.R.Crim.P.

1. The Government has consented to requests (a),[8] (b),[9] and (e).[10]

■■■ 2. Requests (d) [11] and (f) [12] are granted.[13] Defendant Teleprompter is entitled to the grand jury testimony of its officers, directors, agents and employees requested in (d). United States v. United Concrete Pipe Corp., 41 F.R.D. 538 (N.D.Tex.1966). The court also grants request (f) as authorized by Rule 16(b), since it is reasonable and material. The grant, however, is only as to the prior criminal records of each person named in the indictment as a defendant or co-conspirator. Investigations made by the Government as to these persons are denied.

---

8. The transcripts of the testimony of defendant Irving Kahn before the grand jury.

9. Any other relevant written or recorded statements by defendant Kahn within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorneys for the government, including, but not limited to, typewritten or handwritten statements, reports of interviews, notes of interviews, (whether signed or unsigned) and tape or wire recordings, whether made by an attorney for the government or by any other government employee.

10. Any relevant results or reports of scientific tests or experiments made in connection with this case, and with the investigation leading to the indictment, or copies thereof, as are within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorneys for the government, including, but not limited to, fingerprint reports, voice analysis reports and handwriting analysis reports.

11. The transcripts of the testimony of any other officers, attorneys, agents, directors, or employees of defendant Teleprompter Corporation or its Johnstown subsidiary, Johnstown Cable T.V. before the grand jury.

12. Any and all reports in the custody or possession of the government which set forth the prior criminal records or investigations with respect to each person named in the indictment as a defendant or co-conspirator.

13. They are granted only to the extent noted in the opinion, of course.

3. Requests (c)[14] and (g)[15] are denied. The Government is ordered to permit defendants Kahn and Teleprompter to inspect and copy transcripts of the grand jury testimony of any persons listed in request (c) who were employees, officers, agents, directors or attorneys of Teleprompter at the time they so testified. In all other respects request (c) is denied. The court is advised that defendants Tompkins, Deardorff and McKee may testify for the Government at trial. Their statements requested in (f) are therefore statements by prospective Government witnesses, specifically exempt from discovery under Rule 16(b).

## VI. MOTION FOR A BILL OF PARTICULARS

Defendants Kahn and Teleprompter have moved for a bill of particulars.

1. The Government has consented to request number 1.[16]

2. Requests number 2[17] and 5[18] are granted.

3. Requests number 3,[19] 4,[20] and 6[21] are denied. These requests are inquiries into the legal theory of the Government's case, and hence not a proper aspect of a bill of particulars. See United States v. Schillaci, 166 F.Supp. 303, 307 (S.D.N.Y.1958).

14. The transcripts of the testimony of Eugene Weinrich, Caywood Cooley, Walter Kinash, Samuel R. Di Francesco, Jr. and Walter Schier before the grand jury;

15. Any and all written or recorded statements or confessions made by any of the other persons in the indictment named as defendants or as co-conspirators.

16. With respect to paragraph "1" of Count One of the indictment the names of the "other persons whose names are to the grand jury known" who the government will contend conspired with defendants to commit offenses in violation of 18 U.S.C. § 1952 and the names of such alleged co-conspirators who were unknown to the grand jury, but who have since become known to the government.

17. With respect to paragraph "2" of Count One of the indictment, whether the government will contend that the "unlawful activity" referred to therein was bribery in violation of Title 18 §§ 4303 and 4304 of the Penal Code of the State of Pennsylvania and, if not, which Pennsylvania statutes were allegedly violated.

18. With respect to Count Two of the indictment, the acts which constitute the alleged criminal activity, specifying the time and location of the acts.

19. With respect to the entire indictment, whether the government will contend that the bribery alleged therein was part of an unlawful course of interstate racketeering.

20. With respect to the entire indictment, whether the government will contend that any of the defendants were racketeers and, if so, the identity of such defendants.

21. With respect to the entire indictment, on what legal basis the government contends that Teleprompter has committed a crime.